# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA

       Plaintiff,

vs.                                No. CR 22-0466 JB

JOHNATHON BINDUES,

       Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendant's *Daubert* Motion To Preclude Testimony of Daniel O'Donnell, filed February 8, 2023 (Doc. 74)("Motion"). The Court held an evidentiary hearing on March 2, 2023. See Clerk's Minutes, filed March 2, 2023 (Doc. 90). The primary issue is whether the Court should exclude, under rule 702 of the Federal Rules of Evidence, Plaintiff United States of America's proffered opinion witness, Daniel O'Donnell, who will offer testimony on the subject of child sexual abusers' "grooming" practices of child sexual abusers, because, Defendant Johnathon Bindues argues: (i) O'Donnell's testimony does not satisfy the reliability and helpfulness expert opinion testimony standard that Daubert v. Merril Dow Pharmeceuticals, Inc., 509 U.S. 579 (1993)("Daubert"), establishes; and (ii) under rule 403 of the Federal Rules of Evidence, is substantially more prejudicial than probative. The Court concludes that: (i) the testimony O'Donnell will offer is sufficiently reliable and helpful; and (ii) its prejudicial effect does not substantially outweigh its probative value. Accordingly, the Court will permit O'Donnell to testify at Bindues' trial for enticement of a minor in violation of 18 U.S.C. § 2242 and for production of child pornography in violation of 18 U.S.C. § 2251.

## FACTUAL BACKGROUND

The Court draws its facts from the Superseding Indictment and from the parties' briefs. See Superseding Indictment, filed February 22, 2023 (Doc. 88)("Superseding Indictment"); United States' Response to Defendant's Motion to Preclude the Testimony of Daniel O'Donnell, filed March 1, 2023 (Doc. 94)("Response"); Defendant's Reply to Response to *Daubert* Motion to Preclude Testimony of Daniel O'Donnell, filed March 15, 2023 (Doc. 100)("Reply"). Bindues was the coach for a high school girls basketball team. See Response at 1. Over a period of months in 2021, Bindues began exchanging a series of communications by text message with a female student, Jane Doe, on his basketball team that ultimately resulted in Bindues and the student having sexual intercourse and that resulted in Doe sending to Bindues pornographic images of herself. See Response at 1. At the time of these events, Doe was fourteen years old and fifteen years old. See Response at 1.

## PROCEDURAL BACKGROUND

On March 23, 2022, a Federal Grand Jury indicted Bindues for enticement of a minor offenses, in violation of 18 U.S.C. § 2422(b), and for production of child, pornography offenses, in violation of 18 U.S.C. § 2251(a). See Indictment, filed March 23, 2022 (Doc. 2). A Federal Grand Jury later issued a superseding indictment that charged the same offenses, but reduced the number of counts under those statutes. See Superseding Indictment at 1-2. The United States intends to offer into evidence the bulk of the text messages exchanged -- messages which number in the thousands -- to demonstrate how it alleges that Bindues induced Doe to engage in unlawful

sexual relations with him to send him photographs of child pornography.  See Transcript of Hearing at 17:18-18:10, taken February 10, 2023 (Jones, Roybal)("February 10 Tr.").[1]

The United States provides notice that, as part of its case in chief, it seeks to introduce under rule 702, O'Donnell's expert testimony on the subject of "grooming behaviors and dynamics."    United States' Notice of Expert Testimony at 1, filed January 11, 2023 (Doc. 54)("Notice").   The United States indicates that O'Donnell is a lead investigator at the Federal Bureau of Investigation ("FBI") on the subject of child sexual predators, and that O'Donnell has particular expertise on the subject of grooming.  Notice at 1.  Grooming, as the FBI defines the concept, is pre-offense conduct in which a sexual predator engages to make more likely the offender's success in sexually abusing his or her victim: it is a "'dynamic process utilizing a constellation of behaviors aimed at gaining the cooperation of the child to achieve sexual gratification for the offender and/or others,'" Notice at 1-2 (no citation given for quotation).

Bindues moves to exclude O'Donnell's testimony on the subject of grooming, because, he argues, grooming is not a concept with a scientifically accepted definition.  See Motion at 4-5.  Bindues -- supported by his counter-expert report -- argues that the academic research on the subject of grooming demonstrates that there is no widely accepted definition of what constitutes grooming.  See Motion at 4-5; SW Forensic & Clinical Memorandum Report (dated February 2, 2023), filed February 8, 2023 (Doc. 74-2)("Viljoen Report").    Bindues notes that various researchers use different definitions for defining the concept.  See Motion at 4-5; Viljoen Report at 1 ("The evaluators will be making two main points in this report. 1) Grooming is not a generally

---

[1]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

accepted scientific concept, and 2) Grooming currently lacks the necessary scientific evidence to be considered a credible or statistically validated forensic concept."). More broadly, Bindues takes issue with the fact that O'Donnell will not apply his proffered grooming principles to Bindues' case and instead only offer testimony explaining generally the concept of grooming. See Motion at 4-5. Last, he emphasizes the risk of rule-403-of-the-Federal-Rules-of-Evidence confusion and undue prejudice, because, he argues, grooming is so malleable -- any seemingly innocent conduct, e.g., such as buying gifts for a child, he notes, can be made out to constitute grooming. See Motion at 4 ("The risk of confusion and prejudice to the jury from Special Agent O'Donnell's testimony is substantial, given that many of the alleged grooming behaviors are common in normal adult-minor relationships where sexual gratification is not the goal. This may confuse the jury, which is tasked with determining whether Mr. Bindues conduct was intended for the purpose of sexually exploiting Jane Doe."). For these reasons, Bindues argues, the Court should exclude O'Donnell's testimony.

The United States responds that grooming is an accepted concept within the academic community and within law enforcement fields. See Response at 4-7. The United States argues that Bindues overstates the differences among the working definitions that academics have offered, because the United States notes that there are many similarities in the definitions used. See Response at 4-7. The United States argues that the concept of grooming is sufficiently established and well documented that it suffices as a subject for expert testimony under Daubert. See Response at 4-7. The United States emphasizes, moreover, that multiple United States Courts of Appeals, including the United States Court of Appeals for the Tenth Circuit, have approved the admission of expert testimony on the subject of grooming. See Response 7-8. The testimony is helpful, the

United States argues, because not all jurors may be familiar with the concept of grooming and that the information is not unduly prejudicial in violation of rule 403.  See Response at 7-8.

The Court held a hearing at which O'Donnell testified and at which the parties offered argument as to the testimony's admissibility at trial.  See Transcript of Daubert Proceedings before the Honorable James O. Browning, United States District Judge, Albuquerque, Bernalillo County, New Mexico, commencing on March 2, 2023, filed March 24, 2023 (Doc. 101)("March 2 Tr."). O'Donnell testified that he has years of experience investigating child sexual abusers and heads a unit at the FBI targeting that conduct.  See March 2 Tr. at 4:17-18:20 (Roybal, O'Donnell). O'Donnell testified that he has testified as an expert on the subject of grooming in multiple State and federal trials.  See March 2 Tr. at 18:21-21:1 (Roybal, O'Donnell).  O'Donnell explained that grooming involves a cluster of behaviors, by which an offender ingratiates him or herself to an identified prospective child victim, growing increasingly intimate so as to manipulate the victim into engaging in illegal sexual conduct with the offender:

> [T]here isn't necessarily an individual specific behavior that is taken in isolation that could absolutely be identified as grooming.
>
> But rather, that they are clusters or groupings of behaviors that are common to certain child sex offenders that engage in sexual activity with children.  And the primary purposes of those behaviors are to manipulate, exploit, or coerce a child into engaging in those sexual activities with a particular offender.  And so the goals of this process generally include the engagement of sexual activity, the prevention of discovery by third parties, and help to prevent disclosure of the sexual activity by the child.

March 2 Tr. at 22:3-17 (O'Donnell).  O'Donnell notes that, in his investigative work, he has come across how-to guides on grooming that sex offenders have developed to educate other offenders how successfully to groom victims to commit abuse.  See March 2 Tr. at 56:8-22 (O'Donnell). O'Donnell testified that the concept of grooming is highly contextual: under Bindues' cross

examination, O'Donnell stated that many seemingly innocuous conduct in which adults engage with children -- buying a child gifts, playing games with a child, or taking a child on a trip -- is conduct either that could be grooming conduct or could be perfectly innocent.  <u>See</u> March 2 Tr. at 50:11-54:1 (Jones, O'Donnell).  O'Donnell conceded that he did not know if there exists a known error rate for the now existing definitions and models for grooming behavior.  <u>See</u> March 2 Tr. at 61:3-12 (Jones, O'Donnell).   The United States argued that Donnell's testimony indicates the general acceptance of the concept of grooming and that O'Donnell does not state with greater confidence than is appropriate what that concept of grooming can tell jurors about an offender's conduct.  <u>See</u> March 2 Tr. at 76:3-80:18 (Roybal, Court).  Bindues argued that O'Donnell's hearing testimony indicates that the concept lacks sufficient definiteness because any conduct can be made out to conform with grooming activity.  <u>See</u> March 2 Tr. at 80:19-85:10 (Jones, Court).  At times, Bindues disputed whether grooming is a real phenomenon, but at other times accepted that grooming is a phenomenon:

> THE COURT:       Let me ask this question: Did you see in your research of the literature anybody that said grooming just doesn't exist, it's not something that exists at all?

> JONES:                   Yes, I think the articles that I cited on cross-examination said it's not scientifically accepted.

> THE COURT:       I'll go back and look at that.

> JONES:                   But I really think we're just dealing with a situation here where it's just the nature of the allegations that automatically make it grooming.

> . . .

> THE COURT:       Would you agree -- and do you think most experts agree -- that grooming exists?

> JONES:                Yes.  But I consulted with an expert who says: You're
> groomed every day.  You're groomed on the television.  You're groomed by
> advertisements.  I mean, yes, it's a concept.  But I don't think it's helpful.  I mean,
> the way this expert described it to me: You're groomed through everything you do
> every day.  People are grooming you constantly to buy their products.  I mean, yes,
> it's a concept.  But it's so malleable.  It's so undefined.  It's so unclear as to what it
> actually means that I don't know how to determine whether it occurred or not.

March 2 Tr. at 82:13-24 (Court, Jones); id. at 83:21-84:9 (Court, Jones).  The Court indicated that

it is inclined to deny Bindues' motion to exclude O'Donnell's testimony, because, the Court

concluded, jurors may not be familiar with the concept of grooming, and given that grooming is

established sufficiently as a phenomenon within the academic and law enforcement community,

the jury will benefit from learning about the concept.  See March 2 Tr. at 99:17-101:18 (Court).

O'Donnell indicated that he does not know this case's specific facts, and he will not testify

whether, in this specific instance, Bindues groomed his alleged victim.  See March 2 Tr. at 62:18-

63:8 (Jones, O'Donnell).  O'Donnell confirmed at the hearing that he has not learned anything

about this case's facts except the facts given in the motion practice.  See March 2 Tr. at 62:18-63:8

(Jones, O'Donnell).  O'Donnell will testify only to inform the jury about the general concept of

grooming and behaviors typically associated with that conduct.  See March 2 Tr. at 62:18-63:8

(Jones, O'Donnell).  The Court indicated that Bindues can raise on O'Donnell's cross examination

concerns about the grooming concept's malleability.  See March 2 Tr. at 101:6-18 (Court).  These

issues, the Court indicated, go to the testimony's weight.  See March 2 Tr. at 99:17-101:18 (Court).

Moreover, Bindues is free to argue to the jury, the Court indicated, that it should afford little weight

to O'Donnell's testimony.  See March 2 Tr. at 99:17-101:18 (Court).

After the hearing, Bindues filed the Reply, in which he adduces, for the Court's

consideration, federal district court decisions that, on bases similar to those that he argues, have

excluded expert testimony on the subject of grooming.  Bindues offers this additional research in

response to the Court's queries at the hearing whether any federal court ever had excluded expert

testimony on grooming on such bases as those that Bindues offers.  See Reply at 6-8 (discussing

United States v. Raymond, 700 F. Supp. 2d 142 (D. Me. 2010)(Hornby, J.; United States v.

Gonyer, No. CR 12-0021, 2012 WL 3043020 (D. Me. July 24, 2012)(Woodcock, C.J.)).

 After the O'Donnell hearing, the Court held a Daubert hearing on the admissibility of the

competing expert testimony that Bindues proposes to offer from psychologist Simone Viljoen, who

will testify that grooming is not an accepted subject in the academic field and whose testimony the

United States opposes.  See United States' Motion to Exclude the Testimony of Simone Viljoen,

filed March 10, 2023 (Doc. 99)("Viljoen Motion"); Clerk's Minutes, filed March 28, 2023

(Doc. 105).  The Court indicated at that hearing that O'Donnell and Viljoen both could testify at

Bindues' trial.  See Transcript of Hearing at 10:14-11:10, taken March 28, 2023 (Court)("March

28 Tr.").  Both experts' testimony, the Court concluded, would enlighten the jury by providing

context and a useful framework for understanding the theory of liability that the United States

offers and that Bindues contests:

> THE COURT:    I think that the arguments that the
> government's made largely go to the cross-examination, but I . . . do think both
> experts are backed up by peer-reviewed articles and literature in this field, and so
> I'm going to allow both of them to testify.  I expect Mr. O'Donnell to say largely
> what he said here.  And as long as Dr. Viljoen testifies that these are her opinions,
> that she has surveyed the literature and come to the conclusion that the field of
> grooming as Mr. O'Donnell is stating it is flawed and not something that, you know,
> she thinks is consistent because of . . . different definitions of grooming, and that
> we can see certain things as far as grooming in just every day, normal, un-criminal
> activity.  I think those are permissible, and I think that will be helpful to the jury.  I
> think this is all going very much to intent, and that seems to be where this trial is
> kind of boiling down to.
>
>  So I'm going to deny both motions to exclude each others' experts and allow
> the experts to testify.
>
> . . . .

[Viljoen] can testify that grooming and the field of grooming and that whole area has its flaws. And I think as long as she keeps it in terms of flaws and inconsistent definitions and the things that they are including in their definitions, and I assume she will be responding to Mr. O'Donnell's definition of grooming that she has in her papers, that those things -- there's some problems because a lot of very normal, healthy, un-criminal people do very similar things to each other, adults and children.

. . . .

        MR. CORDOVA:    And just to confirm, nothing about -- opinion about whether or not the Defendant engaged in grooming or not?

        THE COURT:      No. Neither expert should do that.

March 28 Tr. at 10:14-11:10 (Court); id. at 12:6-16 (Court); id. 12:25-13:4 (Cordova, Court).

## LAW REGARDING EXPERT TESTIMONY

"Since the Supreme Court of the United States decided Daubert v. Merrell Dow Pharmaceuticals, Inc., trial courts have had the responsibility to make certain that proffered experts will assist the jury in understanding the evidence and in determining the factual issues it must decide." United States v. Gutierrez-Castro, 805 F. Supp. 2d 1218, 1224 (D.N.M. 2011)(Browning, J.). "The Court now must not only decide whether the expert is qualified to testify, but, under Daubert, whether the opinion testimony is the product of a reliable methodology." United States v. Gutierrez-Castro, 805 F. Supp. 2d at 1224. "Daubert v. Merrell Dow Pharmaceuticals, Inc. requires a court to scrutinize the proffered expert's reasoning to determine if that reasoning is sound." United States v. Gutierrez-Castro, 805 F. Supp. 2d at 1224.

    **1.**    **Rule 702.**

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony:

    A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

     **(a)**    the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

     **(b)**    the testimony is based on sufficient facts or data;

     **(c)**    the testimony is the product of reliable principles and methods; and

     **(d)**    the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. Rule 702 thus requires the trial court to "determine whether the expert is proposing to testify to (1) scientific, technical, or other specialized knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." United States v. Muldrow, 19 F.3d 1332, 1337 (10th Cir. 1994)(quoting United States v. Markum, 4 F.3d 891, 895-96 (10th Cir. 1993)). Proposed testimony satisfies the requirement to assist the trier of fact in understanding a fact in issue when it "is sufficiently 'relevant to the task at hand.'" Norris v. Baxter Healthcare Corp., 397 F.3d 878, 884 (quoting Daubert, 509 U.S. at 580). This requirement ensures "that the proposed expert testimony logically advances a material aspect of the case" and that it has "a valid scientific connection to the disputed facts in the case." Norris v. Baxter Healthcare Corp., 397 F.3d at 884 n.2.

Rule 702 uses a liberal definition of "expert." Fed. R. Evid. 702, Advisory Comm. Notes to 1972 Proposed Rules ("[W]ithin the scope of this rule are not only experts in the strictest sense of the word, e.g., physicians, physicists, and architects, but also the large group sometimes called 'skilled' witnesses, such as bankers or landowners testifying to land values."). An expert is "required to possess such skill, experience or knowledge in that particular field as to make it appear that his opinion would rest on substantial foundation and would tend to aid the trier of fact in his search for truth." LifeWise Master Funding v. Telebank, 374 F.3d 917, 928 (10th Cir.

2004)(quoting Graham v. Wyeth Labs., 906 F.2d 1399, 1408 (10th Cir. 1990)). See United States v. Harry, 20 F. Supp. 3d 1196, 1243 (D.N.M. 2014)(Browning, J.)(deeming inadmissible testimony on a sex crime's victim's demeanor during an examination, because "demeanor is not always a reliable indicator whether someone is telling the truth, especially about sex -- then no expert testimony is needed. That knowledge is well within the knowledge of jurors and most people."); United States v. Rodella, No. CR 14-2783, 2014 WL 6634310, at *25 (D.N.M. November 19, 2014)(Browning, J.)(stating that "testimony regarding nationally accepted police standards is irrelevant" to issues of "excessive force and" reasonableness).   The proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the pertinent admissibility requirements are met. See Morales v. E.D. Etnyre & Co., 382 F. Supp. 2d 1252, 1266 (D.N.M. 2005)(Browning, J.)(citing Bourjaily v. United States, 483 U.S. 171, 175 (1987)).  Once the trial court has determined that expert testimony would be helpful to the trier of fact, a witness "may qualify as an expert by 'knowledge, skill, experience, training, or education' and . . . the 'expert' . . . should not be required to satisfy an overly narrow test of his own qualifications."  Gardner v. Gen. Motors Corp., 507 F.2d 525, 528 (10th Cir. 1974). See United States v. Rodella, 2014 WL 6634310, at *20 ("Because of [the proposed expert's] lack of practical experience, lack of nationwide experience, and lack of an advanced degree in criminology or law enforcement, [the proposed expert's] is not qualified to testify about nationally accepted police procedures and practices."); United States v. Goxcon-Chagal, 886 F. Supp. 2d 1222, 1245 (D.N.M. 2012)(Browning, J.)(determining an expert qualified to testify to drug trafficking when he had personal knowledge of the subject from working in the Drug Enforcement Agency for almost fifteen years).

Courts should, under the Federal Rules of Evidence, liberally admit expert testimony, see United States v. Gomez, 67 F.3d 1515, 1526 (10th Cir. 1995)(describing rule 702 as a "liberal standard"), and the trial court has broad discretion in deciding whether to admit or exclude expert testimony, see Werth v. Makita Elec. Works, Ltd., 950 F.2d 643, 647 (10th Cir. 1991)(noting the trial court's decision will not be overturned "unless it is manifestly erroneous or an abuse of discretion"); United States v. Edwards, No. CR 16-3068, 2017 WL 4857441, at *13 (D.N.M. 2017)(Browning, J.); United States v. Bindues, No. CR 22-0466 JB, 2023 WL 3230795, at *18-20 (D.N.M. May 3, 2023)(Browning, J.); United States v. DeLeon, No. CR 15-4268 JB, 2021 WL 4909981, at *20-21 (D.N.M. Oct. 21, 2021)(Browning, J.).

## 2.    **Testimony That Improperly Vouches for Credibility of Another Witness.**

"The credibility of witnesses is generally not an appropriate subject for expert testimony." United States v. Toledo, 985 F.2d 1462, 1470 (10th Cir. 1993)(citing United States v. Samara, 643 F.2d 701, 705 (10th Cir. 1981)).   See United States v. Ganadonegro, 805 F. Supp. 2d at 1213 (D.N.M. 2011)(Browning, J.)(excluding expert testimony on whether defendant's confession was credible).

> There are several reasons for the prohibition against expert testimony on other witness' credibility. Such testimony: (1) "usurps a critical function of the jury"; (2) "is not helpful to the jury, which can make its own determination of credibility"; and (3) when provided by "impressively qualified experts on the credibility of other witnesses is prejudicial and unduly influences the jury."

United States v. Hill, 749 F.3d 1250, 1258 (10th Cir. 2014)(quoting United States v. Toledo, 985 F.2d at 1470).   The bar on credibility bolstering expert testimony is grounded in a number of evidentiary rules.  See United States v. Charley, 189 F.3d 1251, 1267 n.21 (10th Cir. 1999).  Expert testimony that vouches for the credibility of other witnesses lacks "relevance [under rule 401] and would not 'assist the trier of fact as required by Rule 702.'"   United States v. Adams, 271 F.3d

1236, 1246 (10th Cir. 2001)(quoting <u>United States v. Charley</u>, 189 F.3d at 1267).  <u>See United States v. Harry</u>, 20 F. Supp.3d 1196, 1242-43 (D.N.M. 2014)(Browning, J.)(concluding that the expert's testimony was not relevant if expert testified that witness' demeanor suggested that witness was not subjected to a sexual assault, because testimony impermissibly went to witness' credibility).

> Courts have also held that testimony which vouches for the credibility of a witness violates other evidentiary rules, such as Rule 608(a)(1) or Rule 403. Some courts have held that, although Rule 608(a)(1) "permits testimony concerning a witness's general character or reputation for truthfulness," it "prohibits any testimony as to a witness's truthfulness on a particular occasion." <u>State v. Rimmasch</u>, 775 P.2d 388, 391 (Utah 1989)(construing Utah R. Evid. 608); <u>see also United States v. Azure</u>, 801 F.2d 336, 341 (8th Cir. 1986); <u>State v. Wood</u>, 194 W. Va. 525, 460 S.E. 2d 771, 778 (W. Va. 1995)(construing W. Va. R. Evid. 608); <u>People v. Koon</u>, 713 P.2d 410, 412 (Colo. Ct. App. 1985)(construing Colo. R. Evid. 608). And at least one court has held, in a sexual abuse case, that testimony that bolsters the credibility of the complaining witness violates Rule 403's balancing test. <u>United States v. Funds Held in the Name or for the Benefit of John Hugh Wetterer</u>, 991 F. Supp. 112, 120-21 (E.D.N.Y. 1998).

<u>United States v. Charley</u>, 189 F.3d at 1267 n.21.  <u>See United States v. Benally</u>, 541 F.3d 990, 995 (10th Cir. 2008)(affirming district court's exclusion of vouching testimony under rule 403's balancing test).

The bar on vouching for a witness' testimony, however, extends only to expert testimony concerning the witness' credibility and not to an expert's "general and conditional opinions" that are consistent with another witness' testimony.  <u>United States v. Charley</u>, 189 F.3d at 1264 ("[T]he court did not abuse its discretion by allowing [the expert] . . . 'to inform the jury of characteristics in sexually abused children and describe the characteristics the alleged victim exhibits.'" (quoting <u>United States v. Whitted</u>, 11 F.3d 782, 785 (8th Cir. 1993)(brackets added))). <u>See United States v. Chapman</u>, 59 F. Supp. 3d 1194, 1221 (D.N.M. 2014)(Browning, J.)(concluding that expert's testimony in sexual assault case concerning self-injury for victims of traumatic experiences was

permissible and not vouching, despite being consistent with victim's behavior), aff'd 839 F.3d 1232 (10th Cir. 2016). "[T]estimony regarding the characteristics of sexually abused children does not, invariably, amount to vouching for the credibility of an alleged victim." United States v. Parson, 84 F.4th at 938 (citing United States v. Charley, 189 F.3d at 1264-65); United States v. Aguilar, No. CR 21-0670 JB, 2024 WL 2747330, at *14-16 (D.N.M. May 29, 2024)(Browning, J.).

### 3.     Generalized Expert Testimony Regarding Child Sex Abuse Victims.

General expert testimony concerning child sex abuse victims' behaviors and characteristics in the disclosure process, without regard to the specific victim in the pertinent case, is admissible under rule 702. See United States v. Parson, 84 F.4th at 938 (concluding that admission of expert's general testimony on disclosure process without regard to victim is not per se violation of rule 702)(citing United States v. Charley, 189 F.3d at 1264)). Courts further have permitted expert testimony on child sex abuse victims' general characteristics, irrespective of the disclosure process, "provided such testimony is limited to 'a discussion of a class of victims generally.'" United States v. Parson, 84 F.4th at 938 (quoting United States v. Antone, 981 F.2d 1059, 1062 (9th Cir. 1992); United States v. Whitted, 11 F.3d 782, 785 (8th Cir. 1993)). An expert witness' general testimony may serve "to educate the factfinder about general principles, without ever attempting to apply these principles to the specific facts of the case." Fed. R. Evid. 702, Advisory Comm. Notes to 2000 Amendments. See United States v. DeLeon, 423 F. Supp. 3d 1210, 1245 (D.N.M. 2019)(Browning, J.)(concluding that the United States' expert may testify about gang operations generally, but not specifically about the gang in prosecution for racketeering activity, murder, robbery and related offenses); United States v. Begay, 310 F. Supp. 3d 1318, 1352 (D.N.M. 2018)(Browning, J.)(concluding that the expert may testify about police interrogation

tactics generally, because such testimony is relevant and helpful to the fact-finder, but that the expert may not discuss the application of such tactics in the case).

> For example, experts might instruct the factfinder on the principles of thermodynamics, or bloodclotting, or on how financial markets respond to corporate reports, without ever knowing about or trying to tie their testimony into the facts of the case. The amendment does not alter the venerable practice of using expert testimony to educate the factfinder on general principles. For this kind of generalized testimony, Rule 702 simply requires that: (1) the expert be qualified; (2) the testimony address a subject matter on which the factfinder can be assisted by an expert; (3) the testimony be reliable; and (4) the testimony "fit" the facts of the case.

Fed. R. Evid. 702, Advisory Comm. Notes to 2000 Amendments.

> [I]t is . . . within the district court's discretion to determine whether expert testimony will be helpful to the trier of fact. In making that determination, the court should consider, among other factors, the testimony's relevance, the jurors' common knowledge and experience, and whether the expert's testimony may usurp the jury's primary role as the evaluator of evidence.

Ram v. N.M. Dep't of Env't, No. CIV 05-1083, 2006 WL 4079623, at *10 (December 15, 2006)(Browning, J.)(citing United States v. Rodriguez-Felix, 450 F.3d 1117, 1123 (10th Cir. 2006)).  Courts need not set a high standard for determining whether testimony is helpful to the trier of fact.  See Fed. R. Evid. 702, Advisory Comm. Notes to 2023 Amendments ("Applying a higher standard than helpfulness to otherwise reliable expert testimony is unnecessarily strict."). General expert testimony on child sex abuse victims is helpful, "because the average juror often lacks expertise on the characteristics of child sex abuse, particularly in the process of disclosing such abuse." United States v. Parson, 84 F.4th at 938.  Ultimately, "[t]he 'help the trier of fact' language of Rule 702 is a relevance test for expert testimony." United States v. Parson, 84 F.4th at 937 (quoting Etherton v. Owners Ins. Co., 829 F.3d 1209, 1217 (10th Cir. 2016)); United States v. Aguilar, 2024 WL 2747330, at *14-16.

## LAW REGARDING EXPERT TESTIMONY ON ULTIMATE ISSUES

Rule 704 of the Federal Rules of Evidence states:

(a)     **In General -- Not Automatically Objectionable.**   An opinion is not objectionable just because it embraces an ultimate issue.

(b)     **Exception.**   In a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense.   Those matters are for the trier of fact alone.

Fed. R. Evid. 704.   "Traditionally, there was a general doctrine that witnesses could not give their opinion or conclusions on an ultimate issue of fact."   Vondrak v. City of Las Cruces, No. CIV 05-0172, 2009 WL 3241555, at *10 (D.N.M. Aug. 25, 2009)(Browning, J.).   "The stated justification was sometimes that such testimony usurps the function or invades the province of the jury."   Vondrak v. City of Las Cruces, 2009 WL 3241555, at *10 (quoting 1 K. Broun, McCormick on Evidence § 12 (6th ed. 2006 update)).   The Federal Rules of Evidence reflect that the ultimate-issue rule has been abolished.   See United States v. Smith, 156 F.3d 1046, 1054 (10th Cir. 1998). Although rule 704(a) permits an expert to testify about areas that embrace an ultimate issue, there are some other limitations, aside from those that rule 704(b) expresses, regarding testimony on ultimate issues.   More specifically, the Tenth Circuit has stated: "[A]n expert may not state legal conclusions drawn by applying the law to the facts."   A.E. by and Through Evans v. Indep. Sch. Dist. No. 25, of Adair Cty., 936 F.2d 472, 476 (10th Cir. 1991).   See United States v. DeLeon, 423 F. Supp. 3d 1210, 1246 (D.N.M. 2019)(Browning, J.).

"Rule 704(b) prohibits an expert from expressly stating the final conclusion or inference as to a defendant's mental state; it does not prevent an expert from testifying to facts or opinions from which the jury could conclude or infer that the defendant had the requisite mental state." United States v. Ganadonegro, No. CR 09-0312, 2012 WL 592170, at *5 (D.N.M. Feb. 17,

2012)(Browning, J.)(citing United States v. Torres, 53 F.3d 1129, 1141-42 (10th Cir. 1995)).   The restrictions in rule 704(b) do not apply to lay witnesses, see United States v. Goodman, 633 F.3d 963, 968 (10th Cir. 2011), although the lay witnesses' testimony must still be helpful to the trier of fact to satisfy rule 701, see Fed. R. Evid. 701(b).   "[Rules 701, 702, and 403] afford ample assurances against the admission of opinions [under rule 704] which would merely tell the jury what result to reach, somewhat in the manner of the oath-helpers of an earlier day."   United States v. Barile, 286 F.3d 749, 759-60 (4th Cir. 2002).   Pursuant to rule 704, it is the Court's task "to distinguish [helpful] opinion testimony that embraces an ultimate fact from [unhelpful] opinion testimony that states a legal conclusion."   United States v. Perkins, 470 F.3d 150, 158 (4th Cir. 2006)(internal quotation marks omitted)(quoting United States v. Barile, 286 F.3d at 760).   In making that determination, a court should consider whether the question tracks the language of the legal principle or statute at issue, and then consider whether any terms employed have a specialized legal meaning.   See United States v. Perkins, 470 F.3d at 158.   The Court has addressed this issue in various contexts.   See, e.g., Schmidt v. Int'l Playthings LLC, 536 F. Supp. 3d 856, 935-42 (D.N.M. 2021)(Browning, J.); Sec'y & Exch. Comm'n v. Goldstone, No. CIV 12-0257, 2016 WL 3135651, at *1, *44 (D.N.M. May 10, 2016)(Browning, J.)(internal quotation marks omitted)(prohibiting, in a case involving a Form 10-K's allegedly "fraudulent misrepresentations and omissions," expert testimony on whether the defendants' actions were "reasonable" or "certain information" disclosed was "material" and distinguishing the case from Tenth Circuit decisions in which "[t]he issues . . . were far simpler and subject to easy determination by a single expert . . . ."); United States v. Rodella, 2014 WL 6634310, at *29 (rejecting expert testimony as on an ultimate issue when the United States introduced the expert to testify to whether an officer "acted reasonably or violated the Constitution"); United States v. Gould, No. CR 03-2274, 2007

WL 1302596, at *4 (D.N.M. March 17, 2007)(Browning, J.)("The Tenth Circuit has indicated in recent opinions that, in the 42 U.S.C. § 1983 context, the jury cannot use law enforcement policies and standards to inform the debate whether a civil rights violation has occurred" (citing Tanberg v. Sholtis, 401 F.3d 1151, 1163-64 (10th Cir. 2005))); Marquez v. City of Albuquerque, 399 F.3d 1216, 1222 (10th Cir. 2005); Chamberlin v. City of Albuquerque, No. CIV 02-0603, 2005 WL 2313527 (D.N.M. July 31, 2005)(Browning, J.).

## LAW REGARDING EXPERT TESTIMONY BY LAW ENFORCEMENT OFFICERS

"[P]olice officers can testify as experts based on their experience '[b]ecause the average juror is often innocent of the ways of the criminal underworld,'" United States v. Kamahele, 748 F.3d 984, 998 (10th Cir. 2014)(alteration in United States v. Kamahele but not in quoted source) (citation omitted), and "because it is likely to assist the trier of fact to understand an otherwise unfamiliar enterprise," United States v. Wilson, 276 F. App'x 859, 861 (10th Cir. 2008) (unpublished). See United States v. Quintana, 70 F.3d 1167, 1171 (10th Cir. 1995)("This Court has repeatedly held that in narcotics cases, expert testimony can assist the jury in understanding transactions and terminology." (citing United States v. Garcia, 994 F.2d 1499 (10th Cir. 1993); United States v. Sturmoski, 971 F.2d 452, 459 (10th Cir. 1992); United States v. McDonald, 933 F.2d 1519, 1522-23 (10th Cir. 1991); Specht v. Jensen, 853 F.2d 805, 809 (10th Cir. 1988))). The Tenth Circuit "has repeatedly held that in narcotics cases, expert testimony [by a law enforcement officer] can assist the jury in understanding transactions and terminology." United States v. Walker, 179 F. App'x 503, 507 (10th Cir. 2006)(unpublished)(quoting United States v. Quintana, 70 F.3d at 1171). "This rule is based on the Tenth Circuit's recognition that the modus operandi of drug organizations, the value of drug quantities, the language of narcotics dealers, and the tools of the narcotics trade 'are not subjects with which most jurors are familiar.'" United States v.

Hernandez-Mejia, No. CR 05-0469, 2007 WL 2219411, at *4 (D.N.M. April 30, 2007) (Browning, J.)(quoting United States v. McDonald, 933 F.2d 1519, 1522 (10th Cir. 1991)).  Other Circuits are in accord.  See United States v. Martinez, 476 F.3d 961, 967 (D.C. Cir. 2007)("Expert testimony about the methods of drug organizations is common in drug cases."); United States v. Robles-Rosas, 27 F. Appx. 897, 899 (9th Cir. 2001)(unpublished)(holding that the district court did not abuse its discretion in permitting testimony regarding the modus operandi of drug organizations); United States v. Gastiaburo, 16 F.3d 582, 589 (4th Cir. 1994)("[T]estimony on the modus operandi of criminals 'is commonly admitted,' particularly regarding the methods of drug dealers.").  For example, in cases involving possession with intent to distribute, the Tenth Circuit has held that "testimony with regard to the significance of a quantity of drugs possessed is specialized knowledge that assists the jury in understanding a fact at issue."  United States v. Mundy, 97 F. App'x 844, 846 (10th Cir. 2004)(unpublished).  The Tenth Circuit has also recognized that, when a defendant denies awareness, the value of drugs found is relevant to the issue of a defendant's knowledge of the presence of the drugs within the vehicle.  See United States v. Rodriguez, 192 F.3d 946, 949 (10th Cir. 1999)(citing United States v. Hooks, 780 F.2d 1526, 1532 (10th Cir. 1986)).

Although early cases dealing with this genre of expert testimony articulated the standard of admissibility as being whether the expert testimony is "necessary" to achieve jury understanding, United States v. Robinson, 978 F.2d 1554, 1563 (10th Cir. 1992)("[G]ang-related items may necessitate the appearance of an expert witness if the jury could not understand the significance of possession of these items."  (emphasis added)(citation omitted)); id. at 1564-65 ("[T]he expertise of this particular witness was necessary. . . .  The average juror would fail to recognize the 'significance of this evidence without the particular background knowledge' of

gangs and the philosophy of gang membership. 'Without [the expert testimony], the basic evidence <u>would</u> leave a juror puzzled.'"  (emphases added)(quoting <u>United States v. McDonald</u>, 933 F.2d at 1522)), more recent cases -- perhaps as a result of the broader liberalization of expert testimony that accompanying the replacement of the <u>Frye v. United States</u>, 293 F. 1013 (D.C. Cir. 1923)("<u>Frye</u>"), standard with the <u>Daubert</u>, standard -- articulate the standard as being whether the expert testimony "will assist the trier of fact," <u>United States v. Rodriguez-Felix</u>, 450 F.3d 1117, 1122 (10th Cir. 2006), or whether it will be "helpful to the jury," <u>United States v. Kamahele</u>, 748 F.3d at 997.

There are special concerns attendant to law enforcement expert testimony.  The Court will first describe <u>United States v. Medina-Copete</u>, 757 F.3d 1092 (10th Cir. 2014)("<u>Medina-Copete</u>"), which appears to be the sole case from the Tenth Circuit -- which has generally broadly approved expert testimony by law enforcement officers -- reversing a district court for allowing such testimony.  Second, the Court will describe the special dangers of expert testimony by law enforcement officers as other Courts of Appeals, particularly the United States Court of Appeals for the Second Circuit, have outlined them.

1.    **Medina-Copete <u>and Tools of the Trade</u>.**

It is noteworthy that the Tenth Circuit routinely identifies so-called tools of the drug trade -- such as razor blades, pagers and beepers, pistols, and food stamps -- as being particularly appropriate subjects of law enforcement expert testimony, <u>see</u>, <u>e.g.</u>, <u>United States v. Becker</u>, 230 F.3d 1224, 1231 (10th Cir. 2000); <u>United States v. McDonald</u>, 933 F.2d at 1522, but law enforcement expert testimony is not limited to tools of the trade.  The Tenth Circuit has upheld law enforcement expert testimony describing drug-dilution practices and street names for drug weights, <u>see</u> <u>United States v. Quintana</u>, 70 F.3d at 1171, stating that the defendant fits the "profile"

of someone who commits the crime with which the defendant is charged, United States v. Becker, 230 F.3d at 1231, and explaining general procedures followed at drug transactions, such as that "outsiders [are] not . . . allowed to count and handle money," United States v. Wilson, 276 F. App'x at 861.  "Tools of the trade may necessitate the appearance of an expert witness if the jury could not understand the significance of the possession of those items."  United States v. Becker, 230 F.3d 1224, 1231 (10th Cir. 2000).  The Tenth Circuit has held that it is appropriate for the United States to present evidence regarding "typical indicia of drug trafficking activity" in a case where the government sought "to identify for the jury common red flags suggestive of an illicit pharmaceutical operation."  United States v. Lovern, 590 F.3d 1095, 1102 (10th Cir. 2009).  The Tenth Circuit has "upheld the admission of expert testimony detailing the significance of 'a drug dealer's tools of trade: a single-edge razor blade, a pager or beeper, and a loaded pistol.'"  United States v. Becker, 230 F.3d at 1231 (alteration in United States v. Becker).  The Tenth Circuit also has upheld "the admission of expert testimony to 'explain[] the meaning of the physical evidence' officers 'found at the arrest scene . . . where the narcotics were confiscated.'"  United States v. Becker, 230 F.3d at 1231 (quoting United States v. Robinson, 978 F.2d at 1564).  The Tenth Circuit permits an officer to testify "about the common features of drug transactions to assist the jury in understanding the nature of the drug business," including "that most drug organizations are closed and secretive and that it would be unusual for a person who was not otherwise involved in the operation to be present during the transaction."  United States v. Wilson, 276 F. App'x 859, 860-61 (10th Cir. 2008).  The United States Court of Appeals for the Fourth Circuit has recognized that a person properly may be qualified as an expert "in the field of investigative drug trafficking" in a given geographical area.  United States v. Wilson, 484 F.3d 267, 273 (4th Cir. 2007).

In most of the Tenth Circuit's cases, there appears to be no analytical distinction between "tools of the trade" testimony and other law enforcement expert testimony -- the former is simply a prominent genus of the latter.  That said, the Court can find only one case in which the Tenth Circuit held that a district court abused its discretion by permitting law enforcement expert testimony -- Medina-Copete -- and that case reversed the Court at least in part on the basis that the subject about which the law enforcement expert witness testified was not a tool of the trade. Medina-Copete appears to be not only the sole Tenth Circuit case reversing a district court for allowing law enforcement expert testimony, but the only case even holding that a district court abused its discretion in admitting such testimony.[2]  In that case, the Tenth Circuit reversed the Court's decision to allow an expert witness -- Robert Almonte, the United States Marshal for the Western District of Texas -- to testify that a prayer card recovered from the defendants suggested their involvement in the drug trade.  See Medina-Copete, 757 F.3d at 1099.  The prayer card venerated Santa Muerte, a figure whom the Roman Catholic Church does not recognize as a Saint and who is widely called -- by the Marshal and in popular culture[3] -- as a "narco saint."  757 F.3d

---

[2]One could speculate that the wrongful admission of such testimony -- which, by its nature, tends to consist largely of background information -- would be particularly amenable to forgiveness by way of the harmless-error doctrine.  The Tenth Circuit's application of the abuse-of-discretion standard and its decision not to apply harmless error is particularly odd given that the United States Court of Appeals for the Eighth Circuit in United States v. Holmes, 751 F.3d 846 (8th Cir. 2014), had affirmed the district court's admission of the same expert's testimony on the same subject.

[3]In the critically acclaimed television show Breaking Bad -- filmed and set, incidentally, in Albuquerque -- Santa Muerte is featured regularly.  The cold opening of one episode depicts two of the series' more memorable villains crawling long distances on their bellies to reach a shrine to the narco saint and, upon arrival, posting up a hand-drawn picture of an individual whom they hope to murder.  See Breaking Bad: No Mas (AMC television broadcast March 21, 2010).  Now, narco saints are so well known that, after the Tenth Circuit issued Medina-Copete, the Honorable James A. Parker, Senior United States District Judge for the United States District Court for the District of New Mexico, simply allows arresting officers to testify about anything they find on the

at 1101.  The case is an unusual one, in which the Tenth Circuit, for the first time, appeared to

suggest that tools-of-the-trade testimony is analytically distinct from other expert testimony.  See

Medina-Copete, 757 F.3d at 1102-03.  Alternatively, the Tenth Circuit may have been saying that

a prayer card is not a tool of the trade, while implicitly conceding that tools of the trade often

support expert testimony.  Either way, while the Court had ruled that Santa Muerte's association

with the drug trade -- the pseudo-saint is widely popular among the drug cartels, but plays virtually

no role in law-abiding citizens' lives[4] -- was a worthy topic of expert testimony, the Tenth Circuit

wanted something more:

---

arrestee that bears the saint's image, and -- without permitting expert testimony about the saint -- allows the jury to draw its own conclusions.

[4]To be clear, Santa Muerte has nothing to do with Dia de los Muertos, a culturally significant and commonly celebrated holiday in Mexico and the American Southwest.  See Santa Muerte, Wikipedia.org, https://en.wikipedia.org/wiki/Santa_Muerte (last visited July 2, 2015).  Reverence of Santa Muerte is well outside the mainstream and is practiced almost exclusively by marginalized populations, including the criminal underworld.  See New God in Town, Time (Oct. 16, 2007)("The country's Catholic church has deemed Santa Muerte's followers devil-worshiping cultists.").

While reverence for Santa Muerte is almost nonexistent among mainstream, law-abiding citizens, it is not reserved only for the drug cartels.  Petty and non-violent criminals not associated with the drug trade often revere her, and she "is also seen as a protector of homosexual, bisexual, and transgender communities in Mexico, since many are considered to be outcast from society." Santa Muerte, Wikipedia.org (last visited July 2, 2015).  That Santa Muerte is not associated solely with the drug cartels obviously weakens the circumstantial inference that someone like the defendants in Medina-Copete -- who were found in a vehicle that contained a large quantity of well-hidden drugs and a Santa Muerte prayer card in their hands -- is not a blind mule, i.e., a patsy who drives a vehicle that he or she does not know contains hidden drugs.  On the other hand, the Tenth Circuit did not hold that the prayer card itself was inadmissible -- just that expert testimony explaining the card's significance is inadmissible.  The Tenth Circuit's holding may, perversely, be to the detriment of future Santa Muerte-venerating defendants.  In the minds of many law-abiding Americans -- like the ones who serve on federal juries -- Santa Muerte is specifically linked to the Mexican drug cartels.  If the United States shows a Santa Muerte prayer card to the jury without accompanying it with expert testimony explaining its significance, and if even one juror out of twelve has seen Breaking Bad -- highly likely here in Albuquerque -- then the jury is likely to conclude that the defendant is in the drug trade, without considering the valid alternative

Missing from the district court's discussion of Almonte's qualifications is any discussion of *how* his Santa Muerte testimony could legitimately connect Medina's prayer to drug trafficking. There is no evidence that Santa Muerte iconography is "associational," nor was there any allegation that the "main purpose" of Santa Muerte veneration "was to traffic in" narcotics. [United States v. Robinson, 978 F.2d 1554, 1562-63 (10th Cir. 1992)]. Almonte testified that there may be "millions" of followers of Santa Muerte, but he proffered no manner of distinguishing individuals who pray to Santa Muerte for illicit purposes from everyone else. His data comes from his work as a narcotics detective and his compilation of "several cases from law enforcement officers throughout the United States where these items have been involved in drug trafficking and other criminal activity." Mere observation that a correlation exists -- especially when the observer is a law enforcement officer likely to encounter a biased sample -- does not meaningfully assist the jury in determining guilt or innocence.

We are also perplexed by the government's argument that Santa Muerte veneration is a tool of the drug trade. "[T]ools of the trade" are "means for the distribution of illegal drugs." United States v. Martinez, 938 F.2d 1078, 1083 (10th Cir. 1991)(quotation omitted). The government has persistently failed to explain how the Santa Muerte iconography in this case was a "means for the distribution of illegal drugs."[] And in the context of proposed expert testimony about "tools of the trade," the trial court's gatekeeping function should include an inquiry about how the alleged tool serves as a means of distribution. The district court erred by making no such inquiry in this case.

Despite reiterating the word at trial and throughout its appellate briefs, the government acknowledged at oral argument that "use" was an odd verb to describe the relationship between Santa Muerte and those who venerate her. We agree. It is easy to describe how a drug trafficker might "use" a razor blade to cut narcotics for distribution, McDonald, 933 F.2d at 1522, a scale to weigh them, Robinson, 978 F.2d at 1563, and small baggies to package them, United States v. Triana, 477 F.3d 1189, 1195 (10th Cir. 2007). But the government's inability at every stage of litigation to explain precisely how Santa Muerte can be "used" elucidates the poor fit between our "tools of the trade" jurisprudence and Almonte's purported area of expertise. It also highlights that further inquiry by the district court would have revealed that Almonte's testimony would not properly "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a).

---

possibilities that the defendant could merely be a (less culpable) petty criminal or a (completely innocent) homosexual or bisexual person. See supra note 3.

United States v. Medina-Copete, 757 F.3d at 1102-03.  This passage appears to graft a functionality requirement onto rule 702, i.e., it appears to say that a physical object must "do" something related to the crime for the United States to be allowed to present expert testimony about the object.  If so, Medina-Copete represents a departure from the prior cases, in which function is incidental to association, i.e., when some object or practice is a recognizable hallmark of a criminal organization, it is often because that object or practice aided the organization in the pursuit of its criminal goals, but what makes the object or practice useful as evidence is the association -- the fact that organization members use it and non-members do not -- and not the function.  If a criminal organization uses tools of the trade that have extremely high functionality in all aspects of the organization's criminal activity, but very little statistical association with the organization -- e.g., cars, credit cards, or cellular telephones -- such "tools" would provide weak evidence that the person on whom the tool is found is, in fact, a member of the organization.

If that reading is correct, and Medina-Copete grafts a functionality prerequisite onto law enforcement expert testimony, then the case effectively creates a separate and new tools-of-the-trade "doctrine."  How the Tenth Circuit distinguishes a Santa Muerte prayer card from the non-tool "gang-related items" referenced in the second block-quoted paragraph is unclear.[5]

---

[5]It may be that the United States is required to show an association between the item in question and the specific gang in question, rather than just an association between the item and criminality generally, between the item and drug-trafficking generally, or between the item and several gangs.  The third block-quoted paragraph above, see Medina-Copete, 757 F.3d at 1102, suggests that, if more than one gang uses an item, then the item is not associated sufficiently with any one gang to render expert testimony on the association reliable.  The case that Medina-Copete cites for this proposition, however, United States v. Robinson, contains no such limitation.  In fact, the associational evidence of which the Tenth Circuit approves in that case includes that "a preference for things blue tended to show that the defendants were involved in the Crips gang," and, obviously, not everyone who likes the color blue is a Crip.  United States v. Robinson, 978 F.2d at 1561.  It would seem to the Court that the "tightness" of an association between an item and a criminal organization goes to the associational evidence's weight, and not to its admissibility,

Medina-Copete might not be about functionality or tools of the trade at all, however.  After discussing tools of the trade, the Tenth Circuit went on to talk about how the Marshal that the United States had named as its expert witness was unreliable under Daubert, because his

> conclusions are not the product of his personal *law enforcement* knowledge and experience -- he did not gather the information about these prayers and beliefs through surveillance, wiretaps, or even interviews of persons involved in this type of drug trafficking.  Instead, Marshal Almonte calls upon his own self-study of the "iconography of the Mexican drug underworld," his observations of such icons in narcotics cases, his "four or five" trips to Mexico, and his self-published materials and training seminars on the subject.  *United States v. Holmes,* 751 F.3d 846, 854 (8th Cir. 2014)[(Kelly, J., concurring.)][[6]]

> [T]he absence of any explanation about how "visit[ing] several shrines" or "compil[ing] several cases" leads Almonte to the conclusions he reached in this case.  We are forced to conclude that Almonte's "opinion evidence [was] connected to existing data only by the ipse dixit of the expert."  *Kumho Tire,* 526 U.S. at 157, 119 S.Ct. 1167

Medina-Copete, 757 F.3d at 1103-04 (emphasis in both Medina-Copete and in quoted source)(quoting United States v. Holmes, 751 F.3d 846, 854 (8th Cir. 2014)(Kelly, J.,

---

but it may be that, after Medina-Copete, the evidence must clear some threshold level of associational tightness to be reliable under rule 702.

[6]The Marshal also published two books and has spent "hundreds, if not thousands[,] of hours of study' regarding 'how the Mexican drug traffickers involve the spiritual world in their activity.'"  Medina-Copete, 757 F.3d at 1098 (quotation unattributed).  The Court wonders, if a professor had testified instead of a U.S. Marshal, whether the result in Medina-Copete would have been different.  After all, the Tenth Circuit's opinion excluded evidence that it never said was irrelevant or untrue.

concurring)).[7]  For whatever it stands, Medina-Copete is an outlier in an otherwise consistent line

of cases liberally permitting law enforcement expert testimony.[8]

---

[7]In United States v. Holmes, the Eighth Circuit came out the other way on the question the Tenth Circuit decided in Medina-Copete; the Eighth Circuit's case involved the same Marshal, Almonte, and the Eight Circuit upheld his expert testimony on narco saints.  See 751 F.3d at 849. Honorable Jane L. Kelly, United States Circuit Judge for the Eight Circuit, wrote a concurrence in which she stated that she believed that the expert testimony had been improper, but the error was harmless.  See 751 F.3d at 854.  Medina-Copete quotes heavily from, and cites liberally to, Judge Kelly's concurrence.

The Court has always thought it odd that the Tenth Circuit found it to be an abuse of discretion, and reversible error, to allow Almonte to testify, when each member of the Eighth Circuit panel either approved of his testimony or found it erroneous but harmless.  The Tenth Circuit's opinion in Medina-Copete raises questions about what abuse of discretion means in the Tenth Circuit.

[8]The Court suspects that discomfort with the religious nature of the criminal inferences which the prayer card gives rise -- distinct from the expert testimony fleshing out those inferences -- animated the Tenth Circuit's decision at least as much as Daubert principles did. Medina-Copete may thus be an inchoate First Amendment opinion more than it is an expert-witness opinion.

That the Tenth Circuit would be concerned with religious artifacts giving rise to inferences of criminality is not irrational.  For example, regardless whether foreign terrorism thus far in the twenty-first century is statistically associated with Islam, it would be unseemly for the United States to use trappings of a criminal defendant's Islamic faith to support an inference that the defendant was associated with terrorist groups.  Cf. U.S. Const. amend I ("Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ."); Fed. R. Evid. 610 ("Evidence of a witness's religious beliefs or opinions is not admissible to attack or support the witness's credibility.").

Whether and when such concerns rise to the level of a First Amendment violation is an open question in the Tenth Circuit; the Court addressed the issue head-on and decided that expert testimony linking a folk-saint prayer card to the drug trade does not violate the First Amendment -- provided, of course, that the link can be reliably established.  The Tenth Circuit ducked the First Amendment issue, presumably on constitutional-avoidance grounds, but it left the following footnote in the opinion, tipping off readers to its concern:

In this case, several representatives of the federal government took it upon themselves to define -- correctly or, as it appeared at times, not -- the tenets of Catholic theology and the legitimacy of religious practices.  Almonte, a representative of federal law enforcement, testified at length about which saints were "legitimate"; the prosecutors insisted (outside the presence of the jury) that "Santa Muerte is *not a saint*"; and the district court quoted another district court

The Tenth Circuit has spoken on the subject of law enforcement expert testimony since Medina-Copete, and the Tenth Circuit's most recent word on law enforcement expert testimony leaves little doubt as to the liberality of the standard to be applied.  The new case, United States v. Vann, 776 F.3d 746 (10th Cir. 2015)(Tymkovich, J.), explicitly walks back the Tenth Circuit's earlier holding in Medina-Copete:

> [In] a recent case[,] . . . we found an abuse of discretion for admitting testimony of law enforcement personnel about drug traffickers display of "patron saints" for good luck while trafficking.  We held that it was inappropriate to admit speculative, meandering testimony regarding whether veneration of certain "narco" saints during a stop was evidence that the occupants of the vehicle knew that they were transporting drugs.  Agent Small's testimony is not vulnerable to the same attack.
>
> In addition, Medina-Copete is the exception not the rule, and, as noted, we have consistently allowed police officers to testify as to conclusions deriving from their expertise and experience.  At bottom, it is this circuit's longstanding view that "police officers can acquire specialized knowledge of criminal practices and thus the expertise to opine on such matters."

United States v. Vann, 776 F.3d at 759 (citations omitted).

_____

that distinguished Santa Muerte from "legitimate saints."  We urge the government to be cautious about appearing to take sides in theological debates.

Medina-Copete, 757 F.3d at 1109 n.6.  For the record, the Roman Catholic Church maintains an authoritative, nondebatable, and finite list of "legitimate" Saints, and there is a rather elaborate procedure associated with beatification and subsequent canonization.  See The Canonization of Pope John XXIII and Pope John Paul II, United States Conference of Catholic Bishops, http://www.usccb.org/about/leadership/holy-see/canonizations-john-xxiii-john-paul-ii.cfm (last visited June 25, 2024).  Whether someone is a Saint in the Catholic Church is something of which a district court could take judicial notice under rule 201(b)(2), as this status "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  The Court suspects that the Honorable Neil M. Gorsuch, then-United States Circuit Judge for the Tenth Circuit, who is a major proponent and practitioner of Constitutional-avoidance doctrine, was probably persuaded to join the majority opinion to avoid the First Amendment issue.

United States v. Vann also provides a useful characterization of another recent Tenth Circuit case on the topic of law enforcement expert testimony, United States v. Kamahele, ascribing great importance to that case:

> This court's decision in United States v. Kamahele explains the circumstances under which police officers can testify as experts. That case reaffirmed that "police officers can testify as experts based on their experience '[b]ecause the average juror is often innocent of the ways of the criminal underworld.'" Moreover, Kamahele specifically collected cases in which the court had allowed police officers to testify as experts regarding "means and methods of drug dealing." Ultimately, the court upheld the officer's testimony as an expert because he (1) "relied on multiple sources," (2) "based his expert testimony on years of experience," and (3) provided specific "insights into the distinctive traits" of his area of expertise.

United States v. Vann, 776 F.3d at 758 (alteration in original)(citations omitted). It seems unlikely that these three requirements are sufficient, in every case, to render law enforcement expert testimony appropriate. United States v. Vann couples its characterization of United States v. Kamahele with the adages -- applicable in all expert-witness context, and not just with law enforcement experts -- that "the law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination," United States v. Vann, 776 F.3d at 758 (alteration omitted)(emphasis in both United States v. Vann and quoted source)(quoting Kumho Tire Co. v. Carmichael, 526 U.S. 137, 142 (1999)), and that "district courts [need not] extensively explain their reliability determinations," United States v. Vann, 776 F.3d at 758 (quoting United States v. Avitia-Guillen, 680 F.3d 1253, 1260 (10th Cir. 2012)).

## 2.    **The Special Dangers of Expert Testimony by Law Enforcement Officers**.

Although the Tenth Circuit has been generally enthusiastic about law enforcement expert testimony, there are a number of ways in which it can run afoul of the rules of evidence. The

leading case and most comprehensive case in outlining these dangers is United States v. Mejia,

545 F.3d 179, 188-93 (2d Cir. 2008)(Hall, J.)("Mejia").  In that case, the United States

> called Hector Alicea, an investigator with the New York State Police, to testify regarding MS-13's "enterprise structure and the derivation, background and migration of the MS-13 organization, its history and conflicts," as well as MS-13's "hierarchy, cliques, methods and activities, modes of communication and slang." Alicea had been an officer of the New York State Police for eighteen years, and he had been an investigator since 1992.  In June 2000, five years before the trial, Alicea had been assigned to the FBI Long Island Gang Task Force.  He was also the Chair of the Intelligence Committee of the East Coast Gang Investigators Association.
>
> . . . Alicea stated that he had participated in somewhere between fifteen and fifty custodial interrogations of MS-13 members.  When asked whether he could distinguish between information he had learned during custodial interrogations and information he had learned elsewhere, Alicea responded that his knowledge was based on "a combination of both." . . .
>
> Much of Alicea's testimony concerned MS-13's background.  He testified about MS-13's history, its presence on Long Island, and its national and international presence; about the gang's colors, hand signs, graffiti use, naming practices, and tattoos; and about its local subunit structure, leadership structure, division of responsibilities, and membership rules.  In addition, Alicea testified to more specific details about MS-13's operations.  He stated that when MS-13 members fled from prosecution or needed to travel for "gang business reasons," such as "to transport narcotics," "to transport weapons," or "to commit crimes in other areas," they traveled "on a Greyhound bus" or by car.  According to Alicea, MS-13 members from Virginia, California, and El Salvador had attended organizational meetings in New York State, and MS-13 leaders throughout the nation communicated with each other by telephone.  He testified that MS-13 treasury money "[was] used to buy guns," to help members in prison or in other states, or to buy narcotics.  Significantly, Alicea also asserted that MS-13 needed guns "to do what MS 13 does, which is, you know, shoot at rival gang members, and sometimes in the process, obviously, some people get hit."
>
> With respect to MS-13's activities on Long Island, Alicea testified that since he had joined the Task Force in June 2000, the Task Force had seized "[p]robably between 15 and 25" firearms from MS-13 members.  He further testified that Task Force members had seized ammunition, manufactured outside of New York State, from MS-13 members on Long Island.  Moving on to MS-13's narcotics-related operations, Alicea told the jury that MS-13 members on Long Island had been arrested for dealing narcotics, primarily cocaine, and that the gang also occasionally dealt marijuana.  Alicea also stated that MS-13 "tax [ed]" non-gang drug dealers who wished to deal drugs in bars controlled by MS-13.  Most importantly, Alicea

attested that MS-13 had committed "between 18 and 22, 23" murders on Long Island between June 2000 and the trial.

On cross-examination, defense counsel probed the sources of Alicea's information.  Because of the importance of Alicea's answers, we quote from his testimony at length:

> Q.  . . . I thought you mentioned FLS . . . funded itself at the beginning from the sale of marijuana?

> A.  No.  I was referring to the MS-13 gang as a whole.

> Q.  Is it fair to say that somebody told you that?

> A.  I had read that from some of the articles that I had researched.

> Q.  Newspaper articles?

> A.  Reports from other law enforcement personnel.

. . . .

> Q.  You also told us that MS members . . . put a tax on narcotics sales in certain bars; is that correct?

. . . .

> A.  I was told that by a gang member, yes.

. . . .

> Q.  And I believe you told us that some of those [membership] dues were used to purchase narcotics?

> A.  That's correct.

> Q.  Is it fair to say that that was told to you also by somebody who was in custody?

> A.  In custody and some that were not.

> Q.  Well, can you tell me . . . how many people in custody told you in substance that monies collected were used for narcotics?

> A.  Probably like a dozen.

. . . .

A.  . . . I said I am aware that there has been contact between California and New York.

Q.  And how did you become aware of it?

A.  Listening to recordings.

. . . .

Q.  And you stated that you got information with regard to MS-13s involved with Mexican drug cartels; is that correct?

A.  Yes.

Q.  And where did you get that information from?

A.  From research on the Internet.

Q.  Do you know the source of that information on the Internet?

A.  Not off the top of my head.  But I did retrieve that.

Q.  Is it law enforcement or reporters?

A.  I think it is a combination of a reporter doing a story and having a conversation with law enforcement.

. . . .

Q.  . . . [W]ith regard to the involvement of MS-13 [with] the Mexican cartels or Colombian cartels, you never interviewed anybody who told you that, it was strictly from the Internet; is that correct?

A.  That is correct.

Mejia, 545 F.3d at 186-88 (hearing transcript omissions in original)(footnote omitted).  The

Second Circuit had numerous qualms with this testimony:

[D]espite the utility of, and need for, expertise of this sort, its use must be limited to those issues where sociological knowledge is appropriate.  An increasingly thinning line separates the legitimate use of an officer expert to translate esoteric terminology or to explicate an organization's hierarchical

structure from the illegitimate and impermissible substitution of expert opinion for factual evidence.  If the officer expert strays beyond the bounds of appropriately "expert" matters, that officer becomes, rather than a sociologist describing the inner workings of a closed community, a chronicler of the recent past whose pronouncements on elements of the charged offense serve as shortcuts to proving guilt.  As the officer's purported expertise narrows from "organized crime" to "this particular gang," from the meaning of "capo" to the criminality of the defendant, the officer's testimony becomes more central to the case, more corroborative of the fact witnesses, and thus more like a summary of the facts than an aide in understanding them.  The officer expert transforms into the hub of the case, displacing the jury by connecting and combining all other testimony and physical evidence into a coherent, discernible, internally consistent picture of the defendant's guilt.

In such instances, it is a little too convenient that the Government has found an individual who is expert on precisely those facts that the Government must prove to secure a guilty verdict -- even more so when that expert happens to be one of the Government's own investigators.  Any effective law enforcement agency will necessarily develop expertise on the criminal organizations it investigates, but the primary value of that expertise is in facilitating the agency's gathering of evidence, identification of targets for prosecution, and proving guilt at the subsequent trial.  When the Government skips the intermediate steps and proceeds directly from internal expertise to trial, and when those officer experts come to court and simply disgorge their factual knowledge to the jury, the experts are no longer aiding the jury in its factfinding; they are instructing the jury on the existence of the facts needed to satisfy the elements of the charged offense. . . .  The Government cannot satisfy its burden of proof by taking the easy route of calling an "expert" whose expertise happens to be the defendant.  Our occasional use of abstract language to describe the subjects of permissible officer expert testimony cannot be read to suggest otherwise.

This Court has not been blind to these risks.  More than fifteen years ago, we observed that although "the operations of narcotics dealers are a proper subject for expert testimony under Fed. R. Evid. 702, we have carefully circumscribed the use of such testimony to occasions where the subject matter of the testimony is beyond the ken of the average juror." . . .

. . . .

[C]ase agents testifying as experts are particularly vulnerable to making "sweeping conclusions" about the defendants' activities.

We have identified two distinct ways in which the officer expert might "stray from the scope of his expertise."  The expert might . . . "testif[y] about the meaning of conversations in general, beyond the interpretation of code words."  Or,

we noted, the expert might "interpret[ ] ambiguous slang terms" based on knowledge gained through involvement in the case, rather than by reference to the "fixed meaning" of those terms "either within the narcotics world or within this particular conspiracy."

              . . . .

       Testimony is properly characterized as "expert" only if it concerns matters that the average juror is not capable of understanding on his or her own.  See United States v. Amuso, 21 F.3d 1251, 1263 (2d Cir. 1994)("A district court may commit manifest error by admitting expert testimony where the evidence impermissibly mirrors the testimony offered by fact witnesses, or the subject matter of the expert's testimony is not beyond the ken of the average juror."); United States v. Locascio, 6 F.3d 924, 936 (2d Cir. 1992)(applying the "untrained layman" standard articulated in the Advisory Committee Notes to Rule 702).

       Much of Alicea's testimony concerned material well within the grasp of the average juror.  A few examples are particularly striking: Alicea's testimony that the FBI gang task force had seized "[p]robably between 15 and 25" firearms, as well as ammunition, from MS-13 members; his statement that MS-13 members on Long Island had been arrested for dealing narcotics; and his statement that MS-13 had committed "between 18 and 22, 23" murders on Long Island between June 2000 and the trial.  No expertise is required to understand any of these facts.  Had the Government introduced lay witness testimony, arrest records, death certificates, and other competent evidence of these highly specific facts, the jury could have "intelligently" interpreted and understood it.

              . . . .

       Under Rule 703, experts can testify to opinions based on inadmissible evidence, including hearsay, if "experts in the field reasonably rely on such evidence in forming their opinions."  Alicea unquestionably relied on hearsay evidence in forming his opinions.  This hearsay evidence took the form of statements by MS-13 members given in interviews, both custodial and noncustodial, as well as statements made by other law enforcement officers, statements from intercepted telephone conversations among MS-13 members (which may or may not have been hearsay, depending on whether the conversations were in the course of and in furtherance of the charged conspiracies), and printed and online materials.  Alicea's reliance on such materials was consistent with the ordinary practices of law enforcement officers, who "routinely and reasonably rely upon hearsay in reaching their conclusions."

       The expert may not, however, simply transmit that hearsay to the jury.  Instead, the expert must form his own opinions by "applying his extensive experience and a reliable methodology" to the inadmissible materials.  Otherwise,

the expert is simply "repeating hearsay evidence without applying any expertise whatsoever," a practice that allows the Government "to circumvent the rules prohibiting hearsay."

       At trial, Alicea was unable to separate the sources of his information, stating that his testimony was based on "a combination of both" custodial interrogations and other sources.  On cross-examination, however, Alicea identified hearsay as the source of much of his information.  For example, his testimony that the Freeport clique initially funded itself through drug sales was based on "some of the articles that [he] had researched" and "[r]eports from law enforcement personnel."  His testimony about MS-13's taxation of drug sales by non-members was based on a gang member having told him so during a custodial interrogation in this case.  Alicea had learned about MS-13 treasury funds from about a dozen MS-13 members both in and out of custody.  Additionally, Alicea discovered his information about MS-13's involvement in Mexican immigrant smuggling through "research on the Internet," and more specifically from a website containing a media report and an interview with a law enforcement official.  And although Alicea did not identify the source of his statements about the number of firearms the Task Force had seized and the number of murders on Long Island that MS-13 members had committed, we cannot imagine any source for that information other than hearsay (likely consisting of police reports, Task Force meetings, conversations with other officers, or conversations with members of MS-13).

Mejia, 545 F.3d at 190-94, 197 (citations omitted).

    There are, thus, many different angles from which defendants can attack law enforcement officers' expert testimony, and equally many pitfalls into which district courts can fall in admitting such testimony.  The Court can identify at least six such dangers.

    First, as the officer's expertise narrows in scope from broad generalities about certain criminal practices -- which are fixed in a meaning that transcends the case at hand, and about which the expert knew before his involvement in the case being tried -- to practices of which the expert has learned only through his or her investigation of the instant case, there is the danger that the expert is cloaking percipient testimony in the garb of expert opinion.  See Mejia, 545 F.3d at 190 ("As the officer's purported expertise narrows from 'organized crime' to 'this particular gang,' from the meaning of 'capo' to the criminality of the defendant, the officer's testimony becomes

more central to the case, more corroborative of the fact witnesses, and thus more like a summary of the facts than an aide in understanding them.").  At the grand-jury stage, it is common for the United States to put on only a single witness -- a case agent, who succinctly summarizes the case, relaying facts to the grand jury that are outside of the agent's personal knowledge but were transferred to the agent through hearsay.  See United States v. Brito, 907 F.2d 392, 394 (2d Cir. 1990)("The government admits to a policy of using a single witness before the grand jury in narcotics cases where the defendant is already under arrest.").  This practice may be acceptable at the charging stage; the judiciary long ago ceased guarding the grand jury's function as a shield against unjust prosecution, and the institution has largely been rendered a paper tiger in modern times.  See United States v. Basurto, No. CR 13-0969 JB, 2015 WL 4635715, at *13 n.5 (D.N.M. July 29, 2015)(Browning, J.)("[T]he institution of the grand jury has decayed from its standing at the Founding as a meaningful shield from unjust prosecution to its modern status as an investigatory sword for prosecutors.").  The expert-testimony rules are not an invitation to the United States to turn the jury trial into the same type of proceeding, wherein a single expert -- whose expertise is really just in the case at hand -- can serve as proof of the prosecution's entire case.  To prevent this danger, the district court must limit the officer's testimony in three important ways.  First, expert testimony is only proper if a typical juror would be unable to fully understand without expert assistance.  See Fed. R. Evid. 702 advisory committee's notes to the 1972 proposed rule ("Whether the situation is a proper one for the use of expert testimony is to be determined on the basis of assisting the trier . . . .  [The test is] 'whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without [the expert testimony].'"  (citation omitted)); United States v. Amuso, 21 F.3d 1251, 1263 (2d Cir. 1994)("A district court may commit manifest error by admitting expert testimony where

the evidence impermissibly mirrors the testimony offered by fact witnesses, or the subject matter of the expert's testimony is not beyond the ken of the average juror."); United States v. Montas, 41 F.3d 775, 784 (1st Cir. 1994)(disapproving of an expert's answer to the question of why smugglers would use false names -- "'[w]ell that's obvious . . . to avoid being caught'" -- because it was "well within the bounds of a jury's ordinary experience"); United States v. Rahm, 993 F.2d 1405, 1413 (9th Cir. 1993)(precluding expert testimony on "areas believed to be within the jurors' common understanding").

Second, the expert must be able to point to a foundation for his or her expertise that rests principally outside of the facts of the case being tried.  See Fed. R. Evid. 702(d) (requiring that "the expert has reliably applied the principles and methods to the facts of the case" (emphasis added)); Mejia, 545 F.3d at 193 (holding that it is improper for an expert to "'interpret[] ambiguous slang terms' based on knowledge gained through involvement in the case, rather than by reference to the 'fixed meaning' of those terms" (alteration in original)(quoting United States v. Dukagjini, 326 F.3d 45, 55 (2d Cir. 2002))).  The officer cannot develop "expertise" from investigating a case -- e.g., that when members of an organization refer to "haircuts" on the telephone, they are talking about drug deals -- only to "apply" that supposed expertise at trial to prove the very same purported facts -- that the organization's members were referring to drug deals when they used the term "haircuts" in wiretapped conversations -- from which the officer derived the expertise.  Using expert testimony in this circular fashion is misleading to the jury; the district court is, in effect, vouching for a fact witness' conclusions -- and counsel's arguments -- about what the term "haircut" means, by branding the witness an expert and thus suggesting that the witness' process for determining the term's meaning transcends the case at hand.  Third, if a witness testifies as both an expert witness and a percipient witness, the district court should demarcate for the jury

what portions of the testimony are expert opinion[9] and what portions are fact testimony.  See

United States v. Lopez-Medina, 461 F.3d 724, 745 (6th Cir. 2006)("Because there was no

cautionary jury instruction regarding the agents' dual witness roles nor a clear demarcation

between their fact testimony and expert opinion testimony, we conclude that the district court

committed an error that was plain or obvious in permitting the dual-role testimony.").

A second danger inherent in expert testimony by law enforcement officers is common to

all situations where a witness' expertise is based on experience, rather than on scientific or

technical principles.  It is easy for an experience-based expert witness to pass off suspicion,

speculation, and intuition as real expertise.  See Joelle Anne Moreno, What Happens When Dirty

Harry Becomes an (Expert) Witness for the Prosecution?, 79 Tul. L. Rev. 1, 30 (2004)("When an

expert opinion is based on personal experience, opinions and conclusions derived from this

experience are often personal, idiosyncratic, and subjective. . . .  '[T]he practical result is that the

[experience-based expert] witness is immunized against effective cross-examination.'"  (footnote

omitted)).  To prevent this danger, the district court must vigilantly apply the rule 702 reliability

standard to each opinion or assertion to which the defendant objects and, again, ensure that facts

---

[9]The Court, in an attempt never to put its thumb on the scales or its imprimatur on a particular witness, tries not to use the word "expert witness" in front of the jury.  Instead, when an expert witness' proponent asks the Court to accept the witness as an expert, the Court simply says that it will allow the witness to offer opinion testimony in certain areas.  See United States v. Gutierrez-Castro, 805 F. Supp. 2d 1218, 1235 (D.N.M. 2011)(Browning, J.)("[T]he Court will not certify McNutt as an expert witness in the jury's presence, and the jury instructions will not refer to him as an expert.").

At least one court, in its attempt to reduce a law enforcement officer's sway on the jury, refused to allow the United States to refer to its expert witness as an "expert" in front of the jury, instead opting for the term "opinion witness."  United States v. Thomas, 797 F. Supp. 19, 24 (D.D.C. 1992)(Richey, J.).  The Court would not be as inclined to hamstring the United States, particularly in its closing arguments, as it would be to simply be cautious about its own words.

outside of the case at hand back the witness' expertise.  See Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137 (applying the rule 702 reliability standard to nonscientific expert testimony). Although expert witnesses generally need not disclose the bases of their assertions or opinions as they give them, see Fed. R. Evid. 705 ("Unless the court orders otherwise, an expert may state an opinion -- and give the reasons for it -- without first testifying to the underlying facts or data."), an expert's obligation to show his or her work by establishing legitimate bases for the testimony may be higher when the expertise is of an experiential nature, see Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997)(stating that district courts should not "admit opinion evidence that is connected to existing data only by the ipse dixit of the expert"); Erickson v. Baxter Healthcare, Inc., 131 F. Supp. 2d 995, (N.D. Ill. 2001)(Bucklo, J.)("More than bald assertions of opinion without any support are required; this is no more than any rational person would require. . . .  It would be unacceptable to cite no sources for statistical evidence in a scholarly work, and it is likewise unacceptable in an expert disclosure."  (footnote omitted)).  Cf. Olander v. Bucyrus-Erie Co., 187 F.3d 599, 608 (7th Cir. 1999)("[O]ne bald assertion is as good as another . . . .").

A third danger is that stray facts and background information are often more damaging in the context of law enforcement testimony than with other expert testimony.  See Fed. R. Evid. 403. A forensic accountant off-handedly mentioning that an organization's practice of maintaining a bank account in the Cayman Islands is per se suspicious may be somewhat damaging, but a law enforcement officer testifying about how the defendant rose to his position within an organization by supporting the murder of the organization's former leader is likely to be damning.  This observation is not so much a separate danger as it is a recognition that minor errors in admitting expert testimony that should have been excluded -- errors that can happen in a matter of seconds in the courtroom -- can render an entire trial unfair.

A fourth danger is that law enforcement experts who were also involved in the investigation of the case -- the most dangerous kind -- will often attempt to use profile evidence to bolster their conclusions about the defendant.  "[A] profile is simply an investigative technique.  It is nothing more than a listing of characteristics that in the opinion of law enforcement officers are typical of a person engaged in a specific illegal activity."  United States v. Robinson, 978 F.2d at 1563.  "A more tailored definition was offered in Florida v. Royer, 460 U.S. 491, 493 (1983), where drug courier profile was described as an abstract of characteristics found to be typical of persons transporting illegal drugs."  United States v. Robinson, 978 F.2d at 1563 (internal quotation marks omitted).  Although most "[c]ourts have condemned the use of profiles as substantive evidence of guilt," the Tenth Circuit has been consistently more permissive than most other Circuits in allowing such evidence.  United States v. Robinson, 978 F.2d at 1563.  In the first of its two major profile-evidence cases, the Tenth Circuit wrote:

> Rather than focusing our inquiry upon defining and classifying evidence into categories of profile or non-profile, we believe the better approach is to commence our inquiry with an examination of the applicable rules of evidence. Fed. R. Evid. 702 instructs us to admit specialized knowledge if it will assist the trier of fact in understanding the evidence. Rule 702 thus dictates a common-sense inquiry of whether a juror would be able to understand the evidence without specialized knowledge concerning the subject.

United States v. McDonald, 933 F.2d 1519, 1563 (10th Cir. 1991).  The Tenth Circuit continued this approach -- effectively telling district courts not to worry about whether a given piece of evidence is profile evidence -- through its second major profile-evidence case, and it remains unclear today whether and when "profile evidence" -- if a given piece of evidence is agreed to be just that -- is admissible in the Tenth Circuit.  "In McDonald, we 'reserv[ed] the question of whether expert testimony regarding profiles is -- by itself -- substantive proof of crime . . . .'  We again decline to decide that matter, both because this was not evidence of a profile under the

McDonald definition and because the expertise of this particular witness was necessary."  United

States v. Robinson, 978 F.2d at 1564 (omission in original).  Although the Court does not allow

the United States to use the term "profile" in front of the jury, nor has it ever excluded evidence

or curbed testimony on the ground that it would constitute impermissible profile evidence.  United

States v. Goxcon-Chagal, 886 F. Supp. 2d 1222, 1251 (D.N.M. 2012)(Browning, J.)("The United

States should instruct [its witness], however, not to use the word profile to avoid the issue of profile

evidence such that the jury would think about that issue.").  See United States v. Mirabal, No. CR

09-3207 JB, 2010 WL 3894137, at *6-7 (D.N.M. July 31, 2010)(Browning, J.).

     A fifth danger is that the United States will use the expert witness to circumvent the rules

of evidence.  An expert witness may rely upon any

> facts or data in the case that the expert has been made aware of or personally
> observed.  If experts in the particular field would reasonably rely on those kinds of
> facts or data in forming an opinion on the subject, they need not be admissible for
> the opinion to be admitted.

Fed. R. Civ. P. 703.   "The expert may not, however, simply transmit . . . hearsay [or other

inadmissible evidence] to the jury."  Mejia, 545 F.3d at 197.  This danger always exists with regard

to expert witnesses, but it is especially great with law enforcement expert testimony, because -- as

the Court has already mentioned -- the inadmissible facts on which law enforcement experts rely

are often far more prejudicial to the defendant than those on which scientific and technical experts

rely.

     Sixth, and finally, there is something qualitatively different about law enforcement

expertise from other forms of expertise that makes the Court uncomfortable.  When an expert

testifies about DNA left at a crime scene or an organization's bookkeeping, he or she does so in

recognition of the fact that most jurors are inexpert in matters of molecular biochemistry or

forensic accounting, and to aid them in understanding such evidence and making determinations well shy of the final determination of the defendant's guilt or innocence.  Law enforcement officers, on the other hand, are experts in whodunit, and there is a danger that a jury will perceive their area of expertise as solving crimes and determining guilt or innocence.  Juries -- or at least individual jurors -- are inexpert in making these determinations just as surely as they are in biochemistry and forensic accounting, but the Constitution nonetheless consciously vests the power to make these findings in the jury.  See U.S. Const. art. III, § 2; id. amend. VI.  Expert testimony by law enforcement officers can encroach not only on the jury's role, but on the role of counsel, as well.  When the expert opines on the basis of "expertise" rooted in the facts of the case being tried, it is effectively arguing the case as a mouthpiece for counsel.  It is inappropriate for an expert witness to bolster the credibility of another witness, and the Court finds this use of law enforcement expert testimony -- which effectively serves to bolster counsel's arguments about how the jury should interpret the case's facts -- reminiscent of, and analogous to, credibility bolstering.

Even if these dangers do not render a given opinion or piece of testimony per se inadmissible under rule 702, they contribute to its unfair prejudicial value, which the district court may determine substantially outweighs any probative value it might have.  See United States v. Fosher, 590 F.2d 381, 383 (1st Cir. 1979)("Quite apart from questions of limited relevance and reliability, . . . the proffered expert testimony would create a substantial danger of undue prejudice and confusion because of its aura of special reliability and trustworthiness.");  United States v. Aguilar, No. CR 21-0670, 2024 WL 2747330, at *16 (D.N.M. May 29, 2024)(Browning, J.).

**ANALYSIS**

The Court will admit O'Donnell's opinion testimony on the subject of grooming, because the testimony satisfies the reliability and helpfulness standard that <u>Daubert</u> establishes, and because, under rule 403, its prejudicial effect does not outweigh substantially its probative value. The Tenth Circuit already has said, in effect, that testimony on grooming passes the <u>Daubert</u> standard, and every federal Court of Appeals to have considered the issue holds the same. O'Donnell's testimony is based on reliable principles, because the concept of grooming is sufficiently well-defined and established in the relevant expert community, and it passes the rule 403 balancing standard. The Court, therefore, will deny Bindues' Motion.

I.     **O'DONNELL'S TESTIMONY SATISFIES RULE 702, BECAUSE IT SATISFIES DAUBERT<u>'S RELIABILITY AND RELEVANCE STANDARD.</u>**

O'Donnell's proposed testimony passes rule 702's standard, because he is qualified to testify on the subject of grooming, and, under <u>Daubert</u>, his testimony is reliable and will help the jury. O'Donnell is qualified by a long career at the FBI focusing on child sex abuse offenses. The testimony is reliable and helpful, because the Tenth Circuit and other Courts of Appeals, although they have not addressed explicitly Bindues' arguments against the subject's reliability and helpfulness, implicitly foreclose those arguments; they hold that grooming is a proper subject of rule 702 testimony, the proposition that Bindues principally disputes. The Court first discusses these holdings, then considers and rejects the sole two, nonprecedential decisions that Bindues identifies which exclude expert testimony about grooming. These cases do not persuade the Court that O'Donnell's testimony is unreliable and unhelpful. Because, however, the Tenth Circuit and other Courts of Appeals only implicitly reject Bindues' arguments, the Court considers explicitly two arguments he makes, but finds them unconvincing. His argument that experts in the field

define disparately grooming behavior overstates the degree to which experts disagree, and -- regardless -- lack of universal agreement on definitions is not reason to fail O'Donnell on Daubert.  A second, deeper critique about grooming theories' lack of a known error rate is also unconvincing as reason to find the subject unreliable, because the lack of error rate is not fatal to this testimony's reliability.  O'Donnell's testimony explaining grooming generally passes rule-702 muster.  Cf. Fed. R. Evid. 702 cmt. (describing as "venerable" the "practice of using expert testimony to educate the factfinder on general principles").

### A.   O'DONNELL IS QUALIFIED TO TESTIFY ABOUT GROOMING.

O'Donnell satisfies the first requirement to offer 702 opinion testimony, namely, that he is qualified.  Specialized training and substantial length of time in the pertinent field go to establishing an expert's qualifications.  See Conroy v. Vilsack, 707 F.3d 1163, 1169 (10th Cir. 2013)("To qualify as an expert, [a witness] ha[s] to possess skill, experience, or knowledge in the 'particular field' . . . or [the field] ha[s] to fall 'within the reasonable confines' of her expertise." (quoting LifeWise Master Funding v. Telebank, 374 F.3d 917, 928 (10th Cir. 2004)(in turn quoting Graham v. Wyeth Labs., 906 F.2d 1399, 1408 (10th Cir. 1990)), then Ralston v. Smith & Nephew Richards, Inc., 275 F.3d 965, 970 (10th Cir. 2001)(in turn quoting Compton v. Subaru of America, Inc., 82 F.3d 1513, 1520 (10th Cir. 1996)))).  The standard for expert qualifications is "liberal." United States v. Gomez, 67 F.3d 1515, 1525-26 (10th Cir. 1995)("[T]he court's discretion in determining the competency of an expert is broad. . . . [T]he [standard is] liberal . . . under Fed. R. Evid. 702 regarding expert qualifications.").

Here O'Donnell trained formally in psychology and has had years of experience in the specialized field of law enforcement of child sex abuse crimes.  See Tr. at 5:10-20:20 (Roybal, O'Donnell)(discussing background); Supervisory Special Agent Daniel E. O'Donnell at 1-2, 4,

filed March 1, 2023 (Doc. 94-1)("O'Donnell CV").  O'Donnell has worked in this specific field

for a number of years and heads an office at the FBI that specializes in researching and profiling

child sexual exploitation offenses.  See O'Donnell CV at 1-2; Tr. at 4:20-9:11 (Roybal, O'Donnell).

O'Donnell has given multiple talks to law enforcement and legal professional audiences on child

sexual exploitation crimes and grooming specifically.  See Tr. at 16:19-18:20 (Roybal, O'Donnell);

O'Donnell CV at 5-7.  Moreover, O'Donnell has been certified as an expert on grooming in

multiple state and federal criminal trials.  See Tr. at 18:21-21:1 (Roybal, O'Donnell); O'Donnell

CV at 3.  Indeed, Bindues does not contest vigorously that -- if grooming is a proper Daubert

subject -- O'Donnell is qualified to testify about the subject.  See Motion at 4-5 (containing no

argument about qualifications); Reply at 2-10 (same).  The Court concludes that O'Donnell is

qualified.

## B.   O'DONNELL'S TESTIMONY SATISFIES DAUBERT'S RELIABILITY AND HELPFULNESS STANDARDS.

The testimony that O'Donnell will offer at Bindues' trial satisfies Daubert, because it is

based on reliable principles and will help the jury understand the offenses charged.  O'Donnell's

non-scientific, experience-based expertise satisfies the Kumho Tire framework for such testimony

and properly provides an explanation of general principles about criminal behaviors.  See Fed. R.

Evid. 702 cmt. ("For . . . generalized testimony, Rule 702 simply requires that: (1) the expert be

qualified; (2) the testimony address a subject matter on which the factfinder can be assisted by an

expert; (3) the testimony be reliable; and (4) the testimony 'fit' the facts of the case." (no citation

given for quoted language)); United States v. Baines, 573 F.3d 979, 986 (10th Cir. 2009)("[T]he

district courts' 'gatekeeping' obligation as described in Daubert applies to all expert testimony

and . . . district courts may consider the specific Daubert factors to the extent relevant.  '[N]o clear

line' divides 'scientific' and 'technical or other specialized' knowledge, all of which are treated together under Fed. R. Evid. 702." (quoting Kumho Tire, 526 U.S. at 148)(all alterations the Court's)); United States v. Medina-Copete, 757 F.3d 1092, 1104 (10th Cir. 2014)("'[P]olice officers can acquire specialized knowledge of criminal practices and thus the expertise to opine on such matters.'" (quoting United States v. Garza, 566 F.3d 1194, 1199 (10th Cir. 2009))).

O'Donnell's testimony is adequate on both the reliability and the helpfulness Daubert prongs. The Court considers reliability and helpfulness together, because Bindues does not separate out neatly his arguments into each category of analysis. The Tenth Circuit and every other Court of Appeals to consider the issue approves grooming as a subject of expert testimony; insofar as Bindues' arguments principally attack this holding, i.e., arguing that grooming is not proper subject of testimony, then binding Tenth Circuit caselaw and persuasive out-of-Circuit caselaw forecloses this argument. The only two district court decisions excluding expert testimony about grooming are not persuasive. Because, however, Tenth Circuit caselaw only implicitly forecloses Bindues' arguments, the Court considers explicitly those arguments -- that definitions of grooming behavior vary and that the theory has no error rate -- but finds them wanting. In sum, O'Donnell's proposed testimony is reliable and will help the jury.

     1.     **The Great Weight of Precedent Permits Expert Testimony about Grooming, Foreclosing Implicitly Bindues' Arguments that the Subject is Too Unreliable and Unhelpful to Succeed Under a Daubert Analysis.**

The great weight of precedent is against Bindues: every appellate court to consider the issue, including the Tenth Circuit, permits expert testimony about grooming, and Bindues offers only two, dated trial court opinions that exclude such testimony. The Court first discusses these precedents, whose thrust forecloses implicitly the arguments Bindues makes about O'Donnell's

testimony's unreliability and unhelpfulness. Bindues fights a steep uphill battle to convince the Court to exclude O'Donnell's testimony.

>    a.    **The Tenth Circuit, and Every Court of Appeals to Consider the Issue, Permit Expert Testimony on the Subject of Grooming.**

The Tenth Circuit, and every other federal Court of Appeals to consider the issue, permits expert testimony that explains grooming; these holdings strongly imply that Bindues' arguments are incorrect that the subject reflects unreliable principles and is not helpful. Although Bindues is correct that these holdings do not mandate that the Court permit O'Donnell's testimony, these holdings implicitly foreclose Bindues' arguments against the testimony's reliability, because, he argues, grooming itself is unreliable as a theoretical concept. Bindues offers no convincing reason why the Court, if it were to exclude O'Donnell's testimony, should stake out a position so against the great weight of precedent, if not one outright unavailable under binding Tenth Circuit law.

The Tenth Circuit and other appellate courts permit expert testimony about grooming. The Tenth Circuit's most extensive discussion of the issue appears in United States v. Batton, 602 F.3d 1191 (10th Cir. 2010)("Batton"). Noting that "[t]he term 'grooming' is the process whereby a sex offender earns the trust and confidence of a victim before engaging in a sexual act," Batton, 602 F.3d at 1198 n.3 (quoting Sana Loue, Legal and Epidemiological Aspects of Child Maltreatment, 19 J. Legal Med. 471, 479 (1998)), the Tenth Circuit there rejects a challenge to a proposed expert's general issue testimony about what grooming is:

> We have previously allowed testimony regarding criminal methods that are beyond the common knowledge of lay jurors.
>
> . . .
>
>    Dr. Heineke testified that sex offenders are generally not strangers to their victims and their families but are more often than not close family members, friends, or well-respected individuals in a community who often use their positions

to groom their victims into trusting them. . . . This specialized information may very well be beyond the knowledge of many jurors. . . .

Other circuits have reached a similar conclusion. For example, in *United States v. Romero,* 189 F.3d 576 (7th Cir. 1999), the Seventh Circuit held that contemporary expert testimony regarding the modus operandi of child molesters was admissible. *Id.* at 585-87. . . .

Similarly, the Fifth Circuit in *United States v. Hitt,* 473 F.3d 146 (5th Cir. 2006), held that the admission of expert testimony regarding the modus operandi of child molesters, including grooming, was not an abuse of discretion. *Id.* at 158. . . . (citing *United States v. Hayward,* 359 F.3d 631, 636-37 (3d Cir. 2004)(holding that expert testimony regarding the grooming techniques of child molesters was admissible)).

We do not find the trial court abused its discretion in concluding the jurors would benefit from learning of the modus operandi of sex offenders. The methods sex offenders use are not necessarily common knowledge. . . .

Batton, 602 F.3d at 1201-02. The Tenth Circuit has reiterated the conclusions it reached in Batton.

See United States v. Isabella, 918 F.3d 816, 833 n.15 (10th Cir. 2019)("Isabella")("Grooming can

be established by use of an expert witness who testifies about psychological tactics that are

common in cases of child sex abuse. . . . But expert testimony is not necessary to establish

grooming." (citing Batton, 602 F.3d at 1202, United States v. Goetzke, 494 F.3d 1231, 1235 (9th

Cir. 2007), and United States v. Engle, 676 F.3d 405, 412 (4th Cir. 2012)); Isabella, 918 F.3d at

845 n.26 ("Expert testimony on grooming can be admissible to explain the 'modus operandi of sex

offenders. The methods sex offenders use are not necessarily common knowledge.'" (quoting

Batton, 602 F.3d at 1202)).  In addition to the appellate decisions that Batton cites -- from the

United States Courts of Appeals for the Third Circuit, the Fifth Circuit, and the Seventh

Circuit -- other appellate courts also permit experts to testify about grooming:

Dr. Kraft's not-a-typical-predator testimony . . . was limited only to whether certain facts were consistent with the pattern typically seen with individuals who were interested in having sex with minors.  Just as an expert may opine on whether the

packaging of drugs is consistent with distribution, Dr. Kraft could have permissibly testified about whether Soler's actions here were consistent with role-play.

United States v. Soler-Montalvo, 44 F.4th 1, 15 (1st Cir. 2022)("Soler-Montalvo").  See United States v. Telles, 18 F.4th 290, 303 (9th Cir. 2021)("Dr. Turner's 'testimony explained for the jury that [Telles'] behavior with [T.B.]' could be 'innocent [] behavior,' or it 'could actually have been part of his plan to engage in illicit sexual activity with her.' . . . The admission of the testimony, therefore, did not violate Rule 702."  (quoting United States v. Halamek, 5 F4th 1081, 1088 (9th Cir. 2021)(alterations in United States v. Telles, not in United States v. Halamek)); United States v. Long, 328 F.3d 655, 668 (D.C. Cir. 2003)("Lanning's testimony . . . identif[ies] the behavior and actions of child molesters and explain[s] their modus operandi . . . . '[T]his testimony illuminated how seemingly innocent conduct . . . could be part of a seduction technique.'" (quoting United States v. Romero, 189 F.3d at 585)(first alterations the Court's, second alterations in United States v. Long, not in United States v. Romero)); United States v. Houser, 36 M.J. 392, 398-99 (C.M.A. 1993)("[W]e have permitted experts to testify about the behavior of child victims of sexual abuse. . . . Such testimony assists jurors in disabusing themselves of widely held misconceptions.").  The Court identifies no Court of Appeals ruling that grooming is an improper subject of rule 702 testimony.

Bindues is correct that, on their face, the Tenth Circuit's cases and these other decisions do not foreclose automatically Bindues' argument against O'Donnell's testimony.  The cases hold only that district courts possess discretion to admit grooming testimony and not that district courts lack discretion to exclude such testimony; the cases, moreover, are not specifically about the reliability of testimony on grooming.  Thus, the Tenth Circuit holds only that the Court may admit that testimony.  See Batton, 602 F.3d at 1201-02 ("We do not find the trial court abused its

discretion in concluding the jurors would benefit from learning of the modus operandi of sex offenders.  The methods sex offenders use are not necessarily common knowledge. . . ."); Isabella, 918 F.3d at 833 n.15 ("Grooming can be established by use of an expert witness who testifies about psychological tactics that are common in cases of child sex abuse.").  The other, out-of-Circuit cases likewise permit expert grooming testimony, but do not require it.  See United States v. Telles, 18 F.4th at 303; United States v. Romero, 189 F.3d 576; United States v. Hayward, 359 F.3d 631, 636-37; United States v. Long, 328 F.3d at 668; United States v. Hitt, 473 F.3d at 158.  In the Court's reading, however, at least the United States Court of Appeals for the First Circuit mandates, in some situations, admitting expert grooming testimony: the First Circuit has held it an abuse of discretion to exclude expert testimony a defendant sought to introduce to the effect that his behavior was inconsistent with grooming.  See Soler-Montalvo, 44 F.4th at 16-17 ("Dr. Kraft's excluded testimony bore directly on the credibility of Soler's testimony concerning his state of mind and sought to explain (just in the converse of oft-admitted government-expert testimony) how seemingly sinister conduct could be part of innocent sexual fantasy.").  Nonetheless, the Court agrees with Bindues that the Tenth Circuit's caselaw permits the Court to exclude O'Donnell's testimony.

Whether the Court should or -- consistent with Tenth Circuit precedent -- can exclude O'Donnell's testimony for the specific reasons that Bindues advances is a separate question, however: although existing appellate decisions do not address explicitly Bindues' arguments about grooming's conceptual confusion, they strongly imply that avenue is not available to find O'Donnell's testimony about grooming unreliable and unhelpful.  In the Court's reading, these cases necessarily imply the general concept sufficiently reflects reliable principles, at least to serve as a subject for general-issue testimony under rule 702.  See Fed. R. Evid. 702 cmt. (describing as

a "venerable practice" the use of expert testimony to "educate the factfinder about general principles, . . . [f]or example, . . . the principles of thermodynamics, or bloodclotting, or . . . how financial markets respond to corporate reports, without ever knowing about or trying to tie their testimony into the facts of the case").  It is true that the relevant cases speak in the first instance to concerns about expert grooming testimony's helpfulness, its permissibility under 403, and its interaction with other evidentiary rules, such as 404(b)'s prohibition on character evidence and rule 704(b)'s prohibition on an expert's ultimate-issue, mens rea testimony.  See Soler-Montalvo, 44 F.4th at 16-17 (rule 704(b) and rule 403); United States v. Telles, 18 F.4th at 303 (rule 403); United States v. Romero, 189 F.3d 576 (rule 704(b) and rule 403); United States v. Hayward, 359 F.3d 631, 636-37 (rule 704(b) and rule 403); United States v. Long, 328 F.3d at 668; United States v. Hitt, 473 F.3d at 158 (rule 704(b) and rule 403).  Although Bindues is correct that these cases are not primarily about whether the grooming concept reflects sufficiently reliable principles, nevertheless, these cases necessarily imply that grooming's conceptual framework reflects reliable principles.

The Court construes Tenth Circuit caselaw as holding that the concept itself is not inherently unreliable and unhelpful, as Bindues argues.  Cf. March 2 Tr. at 84:2-9 (Jones)("[An] expert described [grooming] to me: You're groomed through everything you do every day. . . . [Y]es, it's a concept. But it's so malleable.  It's so undefined.  It's so unclear as to what it actually means that I don't know how to determine whether it occurred or not.").  Sounding both in reliability and helpfulness, Bindues' arguments that the concept is so confused as to fail Daubert is incompatible with the Tenth Circuit's holdings that grooming is a proper Daubert subject.  See Isabella, 918 F.3d at 833 n.15 ("Grooming can be established by use of an expert witness who testifies about psychological tactics that are common in cases of child sex abuse."); Batton, 602

F.3d at 1201-02 ("We do not find the trial court abused its discretion in concluding the jurors would benefit from learning of the modus operandi of sex offenders. The methods sex offenders use are not necessarily common knowledge. . . ."). The Tenth Circuit would not permit expert general-issue testimony about grooming if it believed the concept inherently unreliable as Bindues argues, i.e., that the concept is a phantasm. Moreover, the Tenth Circuit already effectively has held how the concept is helpful: to explain sexual predators' modus operandi. See Batton, 602 F.3d at 1201-02; United States v. Romero, 189 F.3d at 584 ("Lanning's testimony in general would be reliable and helpful to the jury. . . . in dispelling from the jurors' minds the widely held stereotype of a child molester as 'a dirty old man in a wrinkled raincoat[.]' . . . Many real-life child molesters use modern technology and sophisticated psychological techniques to 'seduce' their victims." (not source given for quoted language)).

The Court could not adopt Bindues' position and follow faithfully Tenth Circuit law, or any other Court of Appeals' law, which hold that experts may explain what grooming is and that this explanation helps the jury. The United States proposes only to offer O'Donnell's testimony on the general concept of grooming; he does not intend to offer a newfangled, untested approach to the subject. Bindues' arguments attack principally the subject matter's conceptual heart, see March 2 Tr. at 83:21-84:9 (Court, Jones), which existing Tenth Circuit and other Court of Appeals precedent say is not so confused as to be an impermissible subject of general-principle testimony, see Fed. R. Evid. cmt. Although the Court possesses the discretion to exclude O'Donnell's testimony, see Batton, 602 F.3d at 1201-02 ("We do not find the trial court abused its discretion in concluding the jurors would benefit from learning of the modus operandi of sex offenders."), the Court sees as unavailable as bases for excluding the testimony those unreliability and

unhelpfulness rationales that Bindues advances, i.e., grooming's indeterminate conceptual character.  The arguments that Bindues advances, therefore, effectively already are out of reach.

### b.    The Only Two District Court Decisions Excluding Expert Grooming Testimony Are Unpersuasive.

In the face of these univocal circuit-level rulings that experts can testify about the concept of grooming, Bindues points to two out-of-Circuit district court cases, each more than a decade old, which exclude expert testimony on grooming.  The Court finds unpersuasive these decisions, which, according to the Court's research, represent the sole dissenting voices on this issue, and whom their Circuit likely abrogated.  In United States v. Raymond, 700 F. Supp. 2d 142 (D. Me. 2010)(Hornby, J.)("Raymond"), the Honorable D. Brock Hornby, United States District Judge for the United States District Court for the District of Maine, excluded an FBI agent's proposed general-principle testimony about grooming, because Judge Hornby concluded the testimony failed both Daubert's reliability requirement and its helpfulness requirement:

> Lanning has decades of experience investigating child molesters, but for whether Lanning's facts and data are sufficient, all that I have is Lanning's *ipse dixit.* Having read his book and his article, I cannot assess his facts and data, and I cannot tell if he has used reliable methods and principles or unjustifiably extrapolated from an accepted premise in reaching his opinions.  He is widely published, but I have no information on what kind of peer review his opinions have received outside of law enforcement investigation and child advocacy.  I do not see that he has accounted for obvious alternative explanations of the behaviors he categorizes.  I understand that his typology has been used by law enforcement, but I do not see that it has been tested or, indeed, that it can be.  I have no idea what the error rate of his typology is, whether the error rate is reasonable, whether there are standards or controls for applying Lanning's opinions in a particular case, or the basis for a lay jury to apply them.  Lanning developed his opinions independently of this litigation, but he developed them for law enforcement investigation purposes in pursuit of other evidence and *suspects.*  I do not know whether Lanning's opinions are generally accepted in the community of psychologists and behavioral scientists for predicting illicit intent or victim truthfulness, and I do not know whether Lanning's professional field reaches reliable results beyond suggesting useful leads for law enforcement investigation.  I also have Lanning's insistence that his profiles should not be used to prove that someone is a child molester.  On "fit," I doubt that

> Lanning's testimony will add much to the jury's common sense. If it does, then it carries the risk of unfair prejudice because of both its unproven reliability (except for use in police investigations searching for other evidence and possible suspects) and its addition of an expert's imprimatur to the government's theory of the case. Given Lanning's statements about the difficulty of interpreting behavior when investigating suspects and evaluating witnesses and given that he will not specifically address the facts in this case, I conclude that the proposed testimony fails almost all the admissibility tests for allowing such testimony in a courtroom, as contrasted with a police investigation.

Raymond, 700 F. Supp. 2d at 152-55.  As the language quoted above indicates, the United States produced for Judge Hornby's consideration only two of its law enforcement expert's own writings, and produced no academic literature about grooming supporting its expert:

> The government has not provided a statement providing specific bases for Lanning's opinions.  Neither has it provided, for example, an affidavit from Lanning explaining how he drew on his experience to develop his account of the behavioral characteristics of child victims or of child molesters.  Instead, following my grant of the defendant's motion for further discovery about the expert testimony, the government points me to Lanning's book, Child Molesters: A Behavioral Analysis, and Lanning's article, "Grooming" and Seduction of Child Victims of Sexual Exploitation (Ex. 3 to Gov't's Opp'n)(Docket Item 65-3).  I have therefore consulted only those two sources.

Raymond, 700 F. Supp. 2d at 147.  One other case, also from the District of Maine, follows Judge Hornby's approach.  See United States v. Gonyer, No. CR 12-0021, 2012 WL 3043020, at *2-3 (D. Me. July 24, 2012)(Woodcock, J.)("Although the Government seeks to distinguish the facts in Raymond from the facts in this case, the Court views Mr. Jenner's proposed opinions as substantially similar to the opinions that Judge Hornby excluded in Raymond. . . . The Court concludes that Mr. Jenner's proposed testimony does not meet Daubert's reliability requirement.").

The Court identifies no other decisions following Raymond, and several others critiquing or declining to embrace it.  See United States v. Maxwell, No. CR 20-0330, 2021 WL 5283951, at *3 (S.D.N.Y. November 11, 2021)(Nathan, J.)(critiquing the objection, which Raymond inspired, "that Dr. Rocchio has not and cannot identify an error rate . . . [as] misplaced in the field of clinical

psychology, particularly when studying the causes and effects of sexual abuse of minors"); Roy v. United States, No. 12-14022-CR, 2021 WL 2269825, at *9 (S.D. Fla. March 2, 2021)(Maynard, M.J.)("Raymond is distinguishable . . . because the expert at issue proffered opinions on a wide-ranging variety of topics relating to child molesters . . . . Det. Warren's testimony was very limited by comparison. Further, Raymond is an out of circuit, district court case. As such, it was not controlling . . . ."), report and recommendation adopted, No. CV 19-4102, 2021 WL 1975206 (S.D. Fla. May 17, 2021)(Moore, C.J.).  As to the lack of supplemental research supporting models of grooming behavior, the United States adduces substantially more research to support O'Donnell's testimony here than it did to support to support Lanning's testimony in Raymond. See Georgia M. Winters & Elizabeth L. Jeglic, I Knew It All Along: The Sexual Grooming Behaviors of Child Molesters and the Hindsight Bias, 25 J. Child Sexual Abuse 20, 21 (2016); Anne-Marie Mcalinden, "Setting 'Em Up": Personal, Familial and Institutional Grooming in the Sexual Abuse of Children, 15 Soc. & L. Stud. 339, 340-41 (2006); Daniel Pollack & Andrea MacIver, Understanding Sexual Grooming in Child Abuse Cases, 34 ABA Child L. Prac. 165, 165 (2015); Georgia M. Winters & Elizabeth L. Jeglic, Stages of Sexual Grooming: Recognizing Potentially Predatory Behaviors of Child Molesters, 38 Deviant Behavior 724, 725 (2017).

Moreover, the Court interprets the First Circuit -- in which the United States District Court for the District of Maine sits -- effectively as abrogating Raymond's reasoning.  The First Circuit in Soler-Montalvo recently found reversible error in a district court's exclusion of an expert on sexual grooming and sexual fantasy role-playing, whose general-principle testimony a defendant sought to introduce to demonstrate that his actions were inconsistent with criminal grooming and were consistent instead only with innocent role-playing.  The First Circuit, in demanding the

testimony's admissibility, looked to the flip-side of that doctrinal coin, i.e., that experts may offer

testimony about grooming:

> Dr. Kraft's not-a-typical-predator testimony was highly relevant to and probative of the key issue in the case. Soler's defense effectively revolved around his argument that he was merely role-playing and did not actually believe Janis was a minor. Dr. Kraft's excluded testimony bore directly on the credibility of Soler's testimony concerning his state of mind and sought to explain (just in the converse of oft-admitted government-expert testimony) how seemingly sinister conduct could be part of innocent sexual fantasy. Cf. United States v. Long, 328 F.3d 655, 666-68 (D.C. Cir. 2003)(finding government expert's child-molester m.o. testimony probative under Rule 403 because it helped show "how seemingly innocent conduct could be part of a seduction technique" (cleaned up)).

Soler-Montalvo, 44 F.4th at 16-17. This result undermines the Raymond result, which explicitly

entertains and implicitly dismisses the rule that Soler-Montalvo establishes -- that a defendant

could offer expert testimony about grooming to show that he was not grooming. See Raymond,

700 F. Supp. 2d at 148-49 ("Lanning describes what the 'grooming or seduction process *usually*

consists of.' . . . But what if a defendant fails to do one of the things that Lanning's child molester

would *usually* do? Can the defendant then argue to the jury that he must therefore *not* have been

grooming a child?" (quoting party's submissions)). In the Court's view, Raymond likely

represents bad law within its own Circuit.

> ### 2. Bindues' Lack-of-Consensus and Conceptual-Confusion Arguments Against O'Donnell's Grooming Testimony's Reliability and Helpfulness Are Unconvincing.

Bindues' arguments cannot succeed in the face of the above-described universal appellate

agreement that experts may offer general-principle testimony about grooming to educate jurors,

see Section I.B.1 supra, at 43-48, and the unpersuasive quality of the sole two dissenting district

court voices. The Court concludes that the Tenth Circuit's and other courts' admission under

Daubert of this testimony foreclose implicitly Bindues' arguments that the grooming concept's

conceptual indeterminateness renders it unreliable and unhelpful as an expert testimony subject: these holdings are incompatible with the proposition that the concept is as confused as Bindues argues.   Nonetheless, because the Tenth Circuit and other courts do not make explicit that conclusion, the Court addresses the arguments that Bindues makes against reliability and helpfulness, namely that scholarly disagreement exists and that the concept is too post-hoc to be reliable.  Neither of these considerations demands the conclusion that O'Donnell's testimony about grooming fails Daubert.

### a. That There Exists Some Variation in Definitions of Grooming Behavior Prevailing in the Expert Community Is Not Sufficient Reason to Hold that the Testimony Is Unreliable.

O'Donnell's testimony is not unreliable on the basis alleged that there is no universally agreed-upon definition of grooming in the expert community.   In the Court's view, Bindues overstates the degree that experts disagree, and, anyway, universal agreement about definitions is unnecessary.   The Daubert framework disavowed Frye's general acceptance rule, and surely did not demand a universal acceptance rule.   Cf. Daubert, 509 U.S. at 589 ("Frye made 'general acceptance' the exclusive test for admitting expert scientific testimony. That austere standard, absent from, and incompatible with, the Federal Rules of Evidence, should not be applied in federal trials." (no source given for quotation)).   Acceptance within the community is only one portion of the reliability analysis, and, particularly in the context of non-scientific, Kumho experts, the pertinent field need not reflect the purity of the hard sciences.   See United States v. Baines, 573 F.3d at 989 ("Although this record raises multiple questions regarding whether fingerprint analysis can be considered truly scientific in an intellectual, abstract sense, nothing in the controlling legal authority we are bound to apply demands such an extremely high degree of intellectual purity.").   The very possibility of dueling experts at a trial presupposes that not all experts will agree on the

relevant definitions or how they apply to the facts; district courts are not required to pick winners and losers among definitions that the academic community offers. See Ruize–Troche v. Pepsi–Cola of P.R., 161 F.3d 77, 85 (1st Cir. 1998)("Daubert neither requires nor empowers trial courts to determine which of several competing scientific theories has the best provenance."); United States v. Maxwell, 2021 WL 5283951, at *2 ("The Defense cites to several contrary articles that suggest experts disagree on the kinds of behaviors that define grooming.  But if experts disagree on the proper interpretation of evidence, 'it is not the Court's role to resolve the dispute through exclusion of one of the expert's opinions.'" (quoting In re Digital Music Antitrust Litig., 321 F.R.D. 64, 80 (S.D.N.Y. 2017)(Preska, J.))); In re Johnson & Johnson Talcum Powder Prod. Mktg., Sales Pracs. & Prod. Litig., 509 F. Supp. 3d 116, 186-87 (D.N.J. 2020)(Wolfson, C.J.)("At best, that the body of relevant scientific evidence is inconclusive and may be open to different interpretations -- does not mean one side's interpretation is more reliable than the other. . . . Ultimately, the question of whose experts are correct is a question for the jury.").

    As the Court notes above, Bindues overstates the degree to which experts disagree on the definition of grooming.  There is, in fact, general agreement that grooming identifies a cluster of behaviors whereby a sexual abuser attempts to facilitate the victim's abuse.  See Georgia M. Winters & Elizabeth L. Jeglic, I Knew It All Along: The Sexual Grooming Behaviors of Child Molesters and the Hindsight Bias, 25 J. Child Sexual Abuse 20, 21 (2016)("Sexual grooming . . . involves the child molester's attempt to gain the trust of his or her victims and their guardians in order for the abuse to be perpetrated without detection. . . . Grooming is typically a long-term process, requiring planning and strategy to cloak the child molester's deviant intentions."); Anne-Marie Mcalinden, "Setting 'Em Up": Personal, Familial and Institutional Grooming in the Sexual Abuse of Children, 15 Soc. & L. Stud. 339, 340-41 (2006)("This term

usually refers to the situation whereby a potential offender will set up opportunities to abuse by gaining the trust of the child in order to prepare them for abuse either directly . . . Grooming is not a new concept."); Daniel Pollack & Andrea MacIver, Understanding Sexual Grooming in Child Abuse Cases,  34 ABA Child L. Prac. 165, 165 (2015)("In many child sexual abuse cases, the abuse is preceded by sexual grooming.  Sexual grooming is a preparatory process in which a perpetrator gradually gains a person's or organization's trust with the intent to be sexually abusive."); Georgia M. Winters & Elizabeth L. Jeglic, Stages of Sexual Grooming: Recognizing Potentially Predatory Behaviors of Child Molesters, 38 Deviant Behavior 724, 725 (2017)(("[A] vast amount of literature . . . suggests there are common grooming behaviors that occur during the processes of selecting a vulnerable victim, gaining access to the child, developing trust, and desensitizing the victim to touch.").   Even the academic texts on which Bindues places emphasis for the proposition that definitional uniformity is lacking betray more agreement than disagreement on the concept's basic definitional contours:

> The two major commonalities in the definitions reviewed as well as the empirical studies of grooming are (a) some sort of inappropriate behavior on the part of the prospective abuser (whether it is a bribe, boundary violation, invasion of privacy, misstatement of morality, mischaracterizing an interaction as a "game," isolation, emotional manipulation, etc.) and (b) the function of this inappropriate behavior is to increase the likelihood that the adult can sexually abuse the child (by, for example, gaining access to them, gaining their trust, silencing them, isolating them, desensitizing them to nudity or sex, etc.).  Each component of the definition may have different topographies in individual cases (e.g., sometimes the inappropriate behavior is removing a door to the child's bedroom, or sometimes it may be buying the child a bikini), but the function of the behavior is to increase the likelihood of future abusive contact.

Natalie Bennett & William O'Donohue, The Construct of Grooming in Child Sexual Abuse: Conceptual and Measurement Issues, 23 J. Child Sexual Abuse 957, 968 (2014).

> Sexual grooming is the deceptive process used by sexual abusers to facilitate sexual contact with a minor while simultaneously avoiding detection.

Prior to the commission of the sexual abuse, the would-be sexual abuser may select a victim, gain access to and isolate the minor, develop trust with the minor and often their guardians, community, and youth-serving institutions, and desensitize the minor to sexual content and physical contact. Post-abuse, the offender may use maintenance strategies on the victim to facilitate future sexual abuse and/or to prevent disclosure

Georgia M. Winters, Leah E. Kaylor & Elizabeth L. Jeglic, <u>Toward a Universal Definition of Child Sexual Grooming</u>, 43 Deviant Behavior 926, 933 (2022).

Both in-person and online sexual grooming of children is a common process used by those who sexually abuse children (Ezioni, 2020; Kool, 2011) and it is estimated that nearly 50% of child sexual abuse (CSA) cases involve sexual grooming (Canter et al., 1998; Finkelhor, 1984; Hall & Hirschman, 1992; Ward, 2002; Ward & Siegert, 2002). Broadly, sexual grooming refers to the method by which an adult manipulates a potential minor victim into situations where sexual abuse can more readily take place while at the same time preventing the minor from disclosing the abuse or others recognizing the inappropriate behaviors (Gallagher et al., 2003; Gillespie, 2001, p. 2004; McAlinden, 2006; Williams, 2015). Child sexual grooming is considered a precursor to the criminal act of CSA; however, in some jurisdictions child sexual grooming in and of itself is considered a standalone criminal offense.

Leah E. Kaylor, Georgia M. Winters, Elizabeth L. Jeglic & Jennifer Cilli, <u>An Analysis of Child Sexual Grooming Legislation in the United States</u>, Psychology, Crime & Law 1 (2022).

O'Donnell, at the <u>Daubert</u> hearing, offered a similar view of what grooming is:

The way that we define grooming within [O'Donnell's FBI unit] is that it's a constellation, a dynamic process involving a constellation of behaviors that are designed to gain the cooperation of a child for the sexual gratification of an offender. And really, that's just a fancy way of saying that there isn't necessarily an individual specific behavior that is taken in isolation that could absolutely be identified as grooming.

But rather, that they are clusters or groupings of behaviors that are common to certain child sex offenders that engage in sexual activity with children. And the primary purposes of those behaviors are to manipulate, exploit, or coerce a child into engaging in those sexual activities with a particular offender. And so the goals of this process generally include the engagement of sexual activity, the prevention of discovery by third parties, and help to prevent disclosure of the sexual activity by the child.

March 2 Tr. at 21:23-22:17 (O'Donnell).  The Court sees more agreement than disagreement among these definitions.  Although there may be disagreement how, in a particular case, these general rules apply -- <u>i.e.</u>, whether in a particular case there is grooming -- the Court sees agreement generally on the principles.

Bindues' emphasis on the lack of universal agreement on definitions harkens back to the <u>Frye</u> approach that requires complete agreement in the relevant expert community.  Universal agreement is not necessary, and, instead, disagreements among experts are grist for jury determination.  See <u>Ruize–Troche v. Pepsi–Cola of P.R.</u>, 161 F.3d at 85 ("<u>Daubert</u> neither requires nor empowers trial courts to determine which of several competing scientific theories has the best provenance."); <u>United States v. Maxwell</u>, 2021 WL 5283951, at *2 ("The Defense cites to several contrary articles that suggest experts disagree on the kinds of behaviors that define grooming.  But if experts disagree on the proper interpretation of evidence, 'it is not the Court's role to resolve the dispute through exclusion of one of the expert's opinions.'" (quoting <u>In re Digital Music Antitrust Litig.</u>, 321 F.R.D. at 80)); <u>In re Johnson & Johnson Talcum Powder Prod. Mktg., Sales Pracs. & Prod. Litig.</u>, 509 F. Supp. 3d at 186-87 ("At best, that the body of relevant scientific evidence is inconclusive and may be open to different interpretations -- does not mean one side's interpretation is more reliable than the other. . . . Ultimately, the question of whose experts are correct is a question for the jury . . . .").  Moreover, as described above, Bindues overstates the extent of disagreement.  Accordingly, Bindues' argument is not convincing as a basis to hold unreliable or unhelpful O'Donnell's testimony.

     **b.**    **That O'Donnell's Model of Grooming Behavior Lacks an Error Rate is Not Reason to Deem It Unreliable and Unhelpful.**

The Court last addresses an argument related to, but distinct from, the lack-of-definitional-consensus argument just discussed, namely, that grooming is untestable.  Although a deep conceptual critique, it ultimately is unpersuasive as a matter of evidence law.  At times, Bindues conflates his lack-of-consensus and his lack-of-testability issues, although, at other times, he separates them out.  Cf. March 2 Tr. at 93 (Jones)("[N]ot only does [the expert literature] say that there is no consensus on how to define grooming, there is [also] no valid method to assess whether grooming has occurred or is occurring.").  The Court concludes that the issues are distinct: the lack of verifiability, the Court views as an issue deeper than mere differences in word-choice between definitions of grooming.  Indeed, in the Court's view, even if there were one-hundred percent agreement in how to define grooming -- if, for example, all experts used O'Donnell's definition, see March 2 Tr. at 21:23-22:17 (O'Donnell)("[Grooming is] a constellation, a dynamic process involving a constellation of behaviors that are designed to gain the cooperation of a child for the sexual gratification of an offender.") -- still, such a model would face this problem.  The Court deems this Bindues' verifiability problem, although other concerns that the parties raise address essentially the same concern: the post-hoc problem, hindsight bias problem, the model's lack of predictive capacity, and the model's lack of error rate.  Among these issues is one that Bindues entertains, and at times embraces, but at other times disavows: that grooming does not exist, is not a real phenomenon, is a phantom concept and is not valid.  Compare March 2 Tr. at 60:2-16 (Jones)(questioning O'Donnell's familiarity with "articles [that] call into question the reliability and the validity of the concept of grooming" and his "understanding of empirical validity and validation of a topic like grooming . . . . How do you test that topic? . . . How do you test if it

occurred or did not?"), with id. at 83:21-23 (Court, Jones)("Would you agree -- and do you think most experts agree -- that grooming exists?" "Yes. . . . [Y]es, it's a concept. But it's so malleable. It's so undefined.  It's so unclear as to what it actually means that I don't know how to determine whether it occurred or not.").  These problems are deeper than differences in phraseology that the available definitions use; the concern here is that once child sexual abuse is at issue, everything leading up to it starts to look like grooming.  Cf. March 2 Tr. at 82:21-24 (Jones)("I really think we're just dealing with a situation here where it's just the nature of the allegations that automatically make it grooming.").  This verifiability problem is conceptual and not semantic.

Difficulties that these arguments identify in expert grooming testimony dissipate when that testimony is viewed as modus operandi testimony, which, indeed, is how the testimony typically is viewed.  See Isabella, 918 F.3d at 833 n.15 ("Grooming can be established by use of an expert witness who testifies about psychological tactics that are common in cases of child sex abuse."); Batton, 602 F.3d at 1201-02 ("We do not find the trial court abused its discretion in concluding the jurors would benefit from learning of the modus operandi of sex offenders.  The methods sex offenders use are not necessarily common knowledge.").  Not all expertise need be subject to the same reliability principles.  Cf. Kumho Tire, 526 U.S. at 150 ("Rule 702['s] inquiry [is] 'a flexible one.' . . . [T]he gatekeeping inquiry must be 'tied to the facts' of a particular 'case.'" (quoting Daubert, 509 U.S. at 594; id. at 593)).  As the Court explains, Bindues' lack-of-testability arguments against the reliability of O'Donnell's grooming testimony implicate equally the reliability of all expert testimony about criminal modus operandi, as well as the reliability of expert testimony about typical crime victim behaviors.  Insofar, therefore, as criminal modus operandi testimony and crime victim behavior testimony are proper Daubert subjects, Bindues' reliability arguments cannot succeed against O'Donnell's testimony about grooming.  Some of Bindues'

same arguments redound to the <u>Daubert</u> helpfulness analysis, but the Court concludes that O'Donnell's testimony is not unhelpful for the reasons that Bindues offers.

       i.      **O'Donnell's Grooming Testimony Is Not Unreliable for the Conceptual-Confusion Reasons that Bindues Advances.**

Bindues' argument cuts deep that grooming is an improper subject for expert testimony, because it is conceptually indeterminate, incapable of verification, insofar as no single behavior can identify whether grooming is occurring. An exchange between Bindues and O'Donnell at the <u>Daubert</u> hearing illustrates this line of argument, which focuses on the fact that grooming identifies seemingly innocuous adult-child interactions, which a secret criminal purpose motivates:

> Q.      I want to walk through some of these phases, stages that you've identified. The first one is identification [based on vulnerabilities]; . . . Most children probably have some kind of insecurity of some sort that makes them vulnerable; correct?
>
> A.      It's possible, yes, ma'am.
>
> Q.      And then the second stage is establishing a connection by showing interest in a child? . . . And so you described taking children to movies, games, sports, that sort of thing . . . . And you'd agree with me that adults can participate in activities with children for reasons that don't involve sexual exploitation[, and that a]dults can give children compliments and not intend to commit any kind of sex offense against the child; right?
>
> A.      Yes, ma'am.
>
> Q.      And the third stage: Gathering information like hopes, fears, that stage; you'd agree with me that an adult can do all of that and not have any intent on sexual gratification; correct?
>
> A.      Certainly possible yes, ma'am.
>
> Q.      So, for example, a school counselor could be interested in a child and where they want to go to college and have no intent on having sex with that child . . . . Or anything of that nature?
>
> A.      Yes, ma'am.

Q.      The fourth stage was filling needs [and exploiting vulnerabilities] . . . . And you gave some examples of that of, you know, taking the child on trips they normally wouldn't be able to . . . . Sporting events, that sort of thing . . . . And you'd agree with me that that type of relationship can exist in a nonsexual relationship also; correct?

A.      It's possible, yes, ma'am.

Q.      For example, an uncle who wants to spoil his niece for a day and take her to the fair, you'd agree with me that doesn't necessarily mean that the uncle has any sexual intentions with that child; right?

A.      Not necessarily, no.

Q.      And then the fifth stage was lowering inhibitions? . . . And you described some examples of wrestling, tickling, bathing, that sort of thing . . . . Again, parents do that with their children every single day, right, and that doesn't necessarily mean that they want sexual contact with their child; right?

A.      Not necessarily, no.

. . .

Q.      I'm going to give you an example.  Say, you have an uncle who is accused of sexually molesting his niece.  You find that the uncle frequently took this niece off to the fair on the weekends. She had an abusive home, so he frequently bought her gifts, took her to movies, really loved this niece. He took care of her, he bathed her, she slept over at his house.  He was close to her.  She confided in him about the troubles going on at her house. And then he's accused of sexually molesting her. Would you describe that behavior that I just mentioned as grooming?

A.      I would want to know the full context of the entirety of the relationship and the totality of behaviors. . . . [I]t's very difficult for me to answer a hypothetical question based just off of those circumstances.

Q.      I need to know when is there grooming, when is there not? Everything I just described, what else do you need know that there is grooming in that situation?

A.      I'd certainly want to know what the context of the child's disclosures were, the overarching vulnerabilities that that child may have, the aspects of the relationship between the two, what types of sexual contact was disclosed. So there is a number of other variables that would be helpful in trying to determine or better explain that.

- 65 -

Q.      Okay. Let's go on to say that it's unequivocally later proven that there was no improper sexual contact. You would agree with me that none of those behaviors that I just described constitute grooming; right?

A.      No, not necessarily. . .  It's possible that those behaviors are not grooming . . . . It's also possible that those behaviors were, but for whatever reason, the actual sexual activity didn't occur. . . .

Q.      So is it the fact that someone is being accused of a sex offense that makes their behavior grooming?

A.      No.  My experience, and the purpose of my testimony today is to explain behaviors that are commonly used among certain child sex offenders to engage a child in sexual activity.  I'm not using that in a predictive fashion of saying that if you have three or four types of behaviors, that that predicts whether or not somebody may become a child sex offender or engage in grooming.

March 2 Tr. at 50:11-53:22 (Jones, O'Donnell)(cleaned up); id. at 54:13-56:15 (Jones, O'Donnell)(cleaned up).

This exchange surfaces those conceptual flaws noted earlier: grooming's lack of verifiability, lack of an identifiable error rate, its post-hoc character, and the threat of hindsight bias.  As Bindues emphasizes and O'Donnell does not dispute, grooming identifies adult behaviors that, on the surface, are normal.  The only thing that differentiates normal conduct from grooming conduct is the groomer's intent -- his or her mental state.

Bindues is not alone in raising these concerns, which abound in the expert literature.  See Winters & Jeglic, I Knew It All Along, supra, at 30 ("As hypothesized, we found that there was a hindsight bias present.  Specifically, participants who had outcome information (i.e., John is a child molester) rated the likelihood they would have known that John was a child molester and would sexually abuse Robbie significantly higher than those who [lacked] . . . outcome information."); Bennett & O'Donohue, Construct of Grooming, supra, at 959 ("[P]sychologists are currently using clinical judgment to determine whether an alleged perpetrator's behaviors are considered

grooming.  The reliability and validity of these judgments are largely unknown, leaving concerns of unacceptable rates of false positives and false negatives.").  Judge Hornby's <u>Raymond</u> opinion raises the same issues:

> I understand that [the expert's] typology has been used by law enforcement, but I do not see that it has been tested or, indeed, that it can be.  I have no idea what the error rate of his typology is, . . . whether there are standards or controls for applying Lanning's opinions in a particular case, or the basis for a lay jury to apply them.

<u>Raymond</u>, 700 F. Supp. 2d at 152.

The deepest critique among those surveyed is whether the grooming typology ultimately is even capable of testing, a critique tantamount to arguing the phenomenon does not exist.  Judge Hornby's suggestion that a grooming typology cannot be tested, <u>see</u> <u>Raymond</u>, 700 F. Supp. 2d at 152 ("I do not see that [the expert's typology] . . . can be [tested]. . . ."), mirrors Bindues' arguments. This problem is the sharpest critique of this subject of expertise.  Although Judge Hornby and Bindues disavow the position that grooming does not exist, <u>see</u> <u>Raymond</u>, 700 F. Supp. 2d at 155 ("I do *not* say that . . . the phenomena he describes do *not* exist." (emphasis in original)); March 2 Tr. at 83:21-23 (Court, Jones)("Would you agree -- and do you think most experts agree -- that grooming exists?" "Yes."), their disavowal rings hollow.  The Court views their critique as tantamount to arguing the phantom-phenomenon position, because the critique suggests that no circumstances exist under which a person can say definitively grooming is or is not occurring, and that the concept lacks truth conditions.  <u>Cf.</u> <u>Truth Condition</u>, Oxford Reference, https://www.oxfordreference.com/ display/10.1093/oi/authority.20110803105953851 (last visited June 11, 2024)("The truth condition of a statement is the condition the world must meet if the statement is to be true.  To know this condition is equivalent to knowing the meaning of the statement.").

Bindues' and related suggestions, however, are incorrect that there is no way to know whether grooming is occurring or not.  The concept does not lack truth conditions, and identifying what those conditions are makes some headway to demonstrating why grooming testimony should be viewed as proper modus operandi testimony.  The exchange between Bindues and O'Donnell quoted above suggests that there is no way to know whether seemingly innocent conduct is grooming -- this suggestion is misbegotten, because there is a way to know whether the conduct is grooming, namely by determining whether the offender took his or her actions with an intent to facilitate the child's abuse.  If, in the hypotheticals Bindues offers above, the adult took normal-seeming actions with an intent to facilitate abuse, then that conduct would be grooming.  Specifically, Bindues' uncle-niece hypothetical is misguided, because it identifies the wrong sine qua non of grooming behavior: in asking O'Donnell whether grooming could have occurred in the absence of sexual contact, see March 2 Tr. at 55:17-21 (Jones)("Let's go on to say that it's unequivocally later proven that there was no improper sexual contact.  You would agree with me that none of those behaviors that I just described constitute grooming; right?"), Bindues asks the wrong question.  Instead of asking whether grooming could occur without sexual contact, Bindues should have asked whether grooming could have occurred without any intent to abuse the victim sexually.  In the Court's understanding of grooming, O'Donnell's testimony is consistent that grooming could occur even without contact.  See March 2 Tr. at 55:22-56:3 (O'Donnell)("No, not necessarily. . . .  It's possible that those behaviors are not grooming or were not associated with the grooming process. It's also possible that those behaviors were, but for whatever reason, the actual sexual activity didn't occur.").  Grooming identifies behaviors that an intent to abuse motivates, so it is the intent that is the sine qua non rather than the ultimate contact.  For this reason, in the uncle-

niece hypothetical that Bindues offers, the relevant question is whether the uncle intended that his conduct and favoritism toward the niece would result in abuse and not that the abuse occur.

This intent-as-sine-qua-non, therefore, makes the testability and verification turn on a finding about intent.  This proposition, therefore, forecloses the argument that the concept is incapable, even in theory, of testing and verification.  Cf. Raymond, 700 F. Supp. 2d at 152 ("I do not see that [the expert's typology] . . . can be [tested]. . . .").  The concept possesses truth conditions, namely, those predicated on the would-be groomer's intent.

Recognizing, however, that a grooming model's verifiability hinges on conclusions about mens rea accomplishes the last turn in the analysis to see O'Donnell's testimony about grooming as proper modus operandi testimony.  Grooming as a theoretical model -- as just discussed -- is verified against conclusions that an accused person possessed a certain wrongful intent.  The American system entrusts juries to make such determinations about intentions and mens rea.  A theory of grooming obviously cannot be tested in a laboratory: no neutral, scientific-theoretical test can spit out values against which to check the model's predictive quality, because there is no way to say definitively that a person had the requisite mental state, i.e., that his behaviors constitute grooming, except to put the accused on trial and have a jury determine one way or the other the facts.  The courtroom -- or the guilty plea proceeding -- is the only appropriate laboratory for testing the accuracy of a typology of grooming.

The conclusion that a person groomed his victim simply is a conclusion that the accused possessed a certain wrongful mens rea, i.e., that the accused engaged in overt or inchoate criminal conduct.  It is for this reason that grooming is a way of labeling conduct made criminal under the federal enticement statute, 18 U.S.C. § 2422(b).  See United States v. Flechs, 98 F.4th 1235, 1244 (10th Cir. 2024)("§ 2422(b) 'criminalizes the sexual grooming of minors, regardless of any intent

to consummate the illegal sexual activity.' . . . The statute thus 'requires only that the defendant intend to entice a minor, not that the defendant intend to commit the underlying sexual act.'" (quoting United States v. Faust, 795 F.3d 1243, 1249 (10th Cir. 2015))).  Some of the literature is therefore inaccurate in stating that grooming is not itself criminal behavior.  Cf. Bennet & O'Donohue, supra, at 959 ("Grooming is generally regarded as prior activities intended to prepare the child for abuse, not actual illegal or abusive activities themselves.").  In some circumstances it can be criminal, because it involves conduct criminally motivated at enticing a victim into abuse: when the United States charges attempted enticement, the substantial step doctrine, a constraint within in federal criminal attempt law, parses out when grooming behavior crosses over to subject it to liability.  See United States v. Flechs, 98 F.4th at 1249 ("Under the requisite 'highly fact-specific inquiry,' [to find a substantial step,] Mr. Flechs's actions fell on the 'illegal inducement' side of the line. . . . Mr. Flechs took a substantial step toward enticement by exchanging sexual messages with the minor, arranging to meet him, and travelling to the meeting place."  (quoting Isabella, 918 F.3d at 832 (in turn quoting United States v. Faust, 795 F.3d at 1248))).  Bindues' argument is thus misplaced that it is solely the allegations' nature that makes conduct grooming: it is not the allegations that make the difference, but the determination that criminal intent was present, i.e., the jury's verdict or the defendant's guilty plea.  Cf. March 2 Tr. at 82:21-24 (Jones)("I really think we're just dealing with a situation here where it's just the nature of the allegations that automatically make it grooming.").   Grooming is best characterized an inchoate, prolonged plan or an extended attempt to commit abuse -- a series of behaviors motivated by an intent to commit sexual abuse and geared toward abuse, aimed at facilitating that crime.  Moreover, not all sexual abuse crimes operate by grooming, e.g., those involving forced abduction and outright rape. Grooming testimony is thus modus operandi testimony.  That conclusion is one the federal Courts

of Appeals, including the Tenth Circuit, already hold.  See Batton, 602 F.3d at 1201-02 ("We do not find the trial court abused its discretion in concluding the jurors would benefit from learning of the modus operandi of sex offenders.  The methods sex offenders use are not necessarily common knowledge. . . ."); Isabella, 918 F.3d at 833 n.15 ("Grooming can be established by use of an expert witness who testifies about psychological tactics that are common in cases of child sex abuse."); Soler-Montalvo, 44 F.4th at 15 ("Dr. Kraft's not-a-typical-predator testimony . . . was limited only to whether certain facts were consistent with the pattern typically seen with individuals who were interested in having sex with minors."); United States v. Telles, 18 F.4th at 303 (9th Cir. 2021)("Dr. Turner's 'testimony explained for the jury that [Telles'] behavior with [T.B.]' could be 'innocent [ ] behavior,' or it 'could actually have been part of his plan to engage in illicit sexual activity with her.' . . . The admission of the testimony, therefore, did not violate Rule 702." (quoting United States v. Halamek, 5 F4th 1081, 1088 (9th Cir. 2021)); United States v. Long, 328 F.3d 655, 668 (D.C. Cir. 2003)("Lanning's testimony . . . identif[ied] the behavior and actions of child molesters and explain[ed] their modus operandi . . . . '[T]his testimony illuminated how seemingly innocent conduct . . . could be part of a seduction technique.'" (quoting United States v. Romero, 189 F.3d at 585)(alterations the Court's)).

The Court therefore finds misguided Raymond's suggestion that testimony about grooming cannot be considered modus operandi testimony.  Judge Hornby's discussion runs thus:

> Some appellate decisions . . . characterize Lanning's testimony . . . as permissible modus operandi testimony.[] Some courts say that just as drug enforcement agents can testify about the modus operandi of drug dealers, Lanning can testify about the modus operandi of adults who molest children. See Romero, 189 F.3d at 584-85. It is common, for example, in drug trafficking cases to permit law enforcement agents to characterize written notations as drug transaction ledgers, interpret innocent-sounding words on a telephone call as referring to particular drugs, describe how drugs are packaged, etc.[] The behavior described by Lanning, however, is significantly different. Lanning does not say anywhere that

there is a culture of child molestation or a set of practices and protocols that child molesters learn from other child molesters in the way that drug dealers adopt certain practices in the business of the drug trade.[23]   Lanning does not purport to have documented a specialized body of knowledge that child molesters use. Instead, what Lanning does is predict individual intent (or encourage juries to do so) from patterns of isolated individual behavior that he has catalogued and categorized, many of which may be indistinguishable from normal social behavior.  It is a huge jump from descriptively categorizing behaviors to predicting intent from those behaviors, a jump that has not been justified on this record.

        []Although illegal, drug distribution is a commercial activity, and its participants necessarily develop common terminology and practices, just as Section 1-205 of the Uniform Commercial Code recognizes for legal commercial activity. As the Advisory Committee Note says, "when a law enforcement agent testifies regarding user code words in a drug transaction, the principle used by the agent is that participants in such transactions regularly use code words to conceal the nature of activities. The method used by the agent is the application of extensive experience to analyze the meaning of the conversations. So long as the principles and methods are reliable and applied reliably to the facts of the case, this type of testimony should be admitted." Fed. R. Evid. Adv. Comm. Notes. The same may be true of other criminal business enterprises, such as prostitution, *see Long,* 328 F.3d at 666 (citing *United States v. Watson,* 171 F.3d 695, 703 (D.C.Cir. 1999) and collecting cases), or gambling operations and terminology, *see United States v. White,* 890 F.2d 1012, 1014 (8th Cir. 1989)(citing *United States v. Scavo,* 593 F.2d 837, 844 (8th Cir. 1979)).

United States v. Raymond, 700 F. Supp. 2d at 155 & 155 n.23.  Aside from the fact that binding Tenth Circuit law already establishes the opposite proposition -- i.e., grooming testimony is proper modus operandi testimony, see Batton, 602 F.3d at 1201-02; Isabella, 918 F.3d at 833 n.15 -- Raymond's concerns are incorrect.

        First, it is not only about commercial-like criminal conduct that experts may offer modus operandi testimony.   See United States v. Pritchard, 964 F.3d 513, 525-26 (6th Cir. 2020)(approving expert testimony that "arsonists derive excitement and gratification from setting fires and often watch the fire or take pictures of the fire's aftermath as a memento[, and that] arsonists generally have financial motives"); United States v. Turner, 400 F.3d 491, 499 (7th Cir. 2005)("The question that was posed was, 'what is the I.R.S. term used to describe the staging of

these types of transactions?' . . . In essence, Hinesley was stating the transactions were of the type that *looked* like structuring, not that they actually were structuring." (no source given for quoted material)(italics in original)); 29 Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 6269.4 (2d ed. 2024)("Daubert applies to expert testimony regarding identity fraud[] and check kiting techniques."). Moreover, O'Donnell's expertise has revealed a criminal child-molester subculture, including the preparation of guides to grooming that abusers have written to educate other abusers. See March 2 Tr. at 71:7-13 (O'Donnell)("There [are] various guides that . . . were written by offenders, for the purpose of educating other offenders in how to go about engaging a child in sexual abuse, and preventing disclosure. Many of those guides use the term 'grooming,' and describe similar behaviors that I described today . . . .").

Second, that grooming identifies superficially innocuous conduct is not a reason to conclude it is not proper modus operandi subject matter. The modus operandi of most criminal conduct involves avoiding detection by concealing criminal conduct as innocuous conduct. Indeed, the use of coded language in the drug trafficking modus operandi context is case-in-point, because the whole purpose of using coded language is to conceal as innocent communications what are actually criminal signals, e.g., one trafficker reports that a drug shipment has arrived by reporting that the bananas were delivered. Cf. Fed. R. Evid. 702 cmt. ("[T]he terms 'principles' and 'methods' . . . remain relevant when applied to testimony based on technical or other specialized knowledge. For example, . . . the principle used by the agent [testifying about drug trade code words] is that participants in such transactions regularly use code words to conceal the nature of their activities."). It is not only activity of an obviously criminal character about which experts may offer modus operandi testimony.

Last, Raymond's suggestion is misguided that the modus operandi testimony doctrine is unavailable because the sole inference to be drawn is mental state.  Indeed, in the Soler-Montalvo case discussed above -- which the Court interprets as abrogating Raymond -- the First Circuit reaches such a conclusion.    There,  the First Circuit explains that grooming testimony's flipside -- expert testimony about sexual fantasy roleplay -- validly may be offered to demonstrate that a defendant's conduct does not fit a sexual predator mold and instead fits a fantasy role-player mold, where the inference to be drawn is that the defendant does not possess the requisite mens rea:

> Dr. Kraft's not-a-typical-predator testimony was highly relevant to and probative of the key issue in the case.  Soler's defense effectively revolved around his argument that he was merely role-playing and did not actually believe Janis was a minor.  Dr. Kraft's excluded testimony bore directly on the credibility of Soler's testimony concerning his state of mind and sought to explain (just in the converse of oft-admitted government-expert testimony) how seemingly sinister conduct could be part of innocent sexual fantasy.  Cf. United States v. Long, 328 F.3d 655, 666-68 (D.C. Cir. 2003)(finding government expert's child-molester m.o. testimony probative under Rule 403 because it helped show "how seemingly innocent conduct could be part of a seduction technique" (cleaned up)).

Soler-Montalvo, 44 F.4th at 16-17.  Compare with Raymond, 700 F. Supp. 2d at 148-49 ("Lanning describes what the 'grooming or seduction process usually consists of.' . . . But what if a defendant fails to do one of the things that Lanning's child molester would usually do?  Can the defendant then argue to the jury that he must therefore not have been grooming a child?" (quoting party's submissions)(emphasis in Raymond, not in party's submissions)).  The Soler-Montalvo case demonstrates that general principle modus operandi testimony may be offered for the purpose of empowering the jury to draw inferences about mental states.[10]

---

[10]The Supreme Court recently decided a rule 704(b) case, Diaz v. United States, No. 23-14, 2024 WL 3056012 (U.S. June 20, 2024)("Diaz"), with ramifications for the use of modus operandi testimony that promote inferences about mens rea.  The Diaz defendant is a drug mule,

charged under a statute that required she "knowingly" transported narcotics; she "asserted what is known colloquially as a 'blind mule' defense[,] . . . argu[ing] that she did not know that there were drugs in the car." Diaz, 2024 WL 3056012, at *3 (no citation given for quoted language). She was convicted after a trial at which law enforcement agent Andrew Flood testified as an expert that "'in most circumstances, the driver knows they are hired . . . to take the drugs from point A to point B.'" Diaz, 2024 WL 3056012, at *3 (quoting party's brief). Flood apparently did not apply his model of cartel behavior to the facts at hand. See Diaz, 2024 WL 3056012, at *3.

Flood's testimony, the Supreme Court holds, does not violate rule 704(b)'s prohibition on ultimate-issue testimony about a criminal defendant's mental state that is an element of the charged offense. See Diaz, 2024 WL 3056012, at *5 ("Because Agent Flood did not express an opinion about whether Diaz herself knowingly transported methamphetamine, his testimony did not violate Rule 704(b). Agent Flood instead testified about the knowledge of *most* drug couriers." (emphasis in original)). The testimony was not about the defendant, but instead an ascription of mental state to a class of persons to which the defendant may or may not belong; because the expert did not testify that all persons like the defendant have the requisite mens rea, and because the expert did not opine that the defendant belonged to the less-than-all group bearing that mens rea descriptor, the testimony was not about Diaz' mental state at the time of the offense, in violation of rule 704(b):

> Take for example an expert who testifies at an arson trial that all people in the defendant's shoes set fires maliciously (the mental state required for common-law arson). Although the expert never spoke the defendant's name, the expert nonetheless violated Rule 704(b). That is because the expert concluded that the defendant was part of a group of people that all have a particular mental state. The phrase "all people in the defendant's shoes" includes, of course, the defendant himself. So, when the expert testified that all people in the defendant's shoes always set fires with malicious intent, the expert also opined that the defendant had that mental state. The expert thus stated an opinion on the defendant's mental state, an ultimate issue reserved for the jury, in violation of Rule 704(b).

> Here, by contrast, Agent Flood asserted that Diaz was part of a group of persons that *may or may not* have a particular mental state. Of all drug couriers -- a group that includes Diaz -- he opined that the majority knowingly transport drugs. The jury was then left to decide: Is Diaz like the majority of couriers? Or, is Diaz one of the less-numerous-but-still-existent couriers who unwittingly transport drugs? The ultimate issue of Diaz's mental state was left to the jury's judgment.

Diaz, 2024 WL 3056012, at *5-6. It remains for the jury to determine whether Diaz belongs to the group as to which the expert's opinion ascribes knowledge. Simplified, the Supreme Court's holding may be expressed thus: expert testimony of the form "most Xs have mental state A" is permissible, because the jury must still determine whether the defendant is an X; but neither the testimony "most Xs have mental state A, and the defendant is an X" is permissible, nor is "all Xs have mental state A" if the defendant is an X.

Diaz draws a concurrence and a dissent. Concurring, the Honorable Ketanji Brown Jackson, Associate Justice of the Supreme Court, explains that the majority's rule redounds to the

benefit of both prosecutors and defendants: rule 704(b) is "party agnostic," and testimony analogous to the testimony offered in Diaz' case could be offered to negate mens rea, e.g., when a defendant's expert testifies in support of a duress or self-defense defense that most persons in a class to which the jury may determine the defendant belongs lack the requisite mens rea.  Diaz v. United States, No. 23-14, 2024 WL 3056012, at *7 (U.S. June 20, 2024)(Jackson, J., concurring).  See id. at *8 ("Rule 704(b) allows experts to testify about the typical mental states of those with battered woman syndrome . . . . Such evidence can play a pivotal role in a defendant's attempts both to disprove the *mens rea* . . . and to support a range of defenses, including duress and self-defense.").  The Honorable Neil M. Gorsuch, Associate Justice for the Supreme Court, dissented, in an opinion that the Honorable Sonia Sotomayor and the Honorable Elena Kagan, Associate Justices for the Supreme Court, joined.  Justice Gorsuch viewed the expert's testimony as being impermissibly about Diaz' mental state, critiquing the majority's allowance for holding that because the expert's testimony ascribed mental state in probabilistic terms rather than absolute terms -- some mules, not all mules -- a distinction without a difference, in Justice Gorsuch's view:

> [The United States agrees that] an expert cannot testify that *all* persons in a class that includes the defendant have a culpable mental state. Brief for United States 36. But, the government insists, everything changes when an expert offers (as Agent Flood offered) only a *probabilistic* assessment that *most* such persons do. . . . I cannot see how that gambit begins to solve the government's problem.

Diaz v. United States, 144 S. Ct. 1727, 1741 (2024)(Gorsuch, J., dissenting).

Diaz' holding effectively sanctions the use of general-issue modus operandi expert testimony that contains ascriptions of mental state.  Although the phrase "modus operandi" does not appear, Flood's testimony effectively was modus operandi testimony about how drug couriers operate generally, see Diaz, 2024 WL 3056012, at *3 ("[A]gent Andrew Flood testified as an expert that 'in most circumstances, the driver knows they are hired . . . to take the drugs from point A to point B.'"), and the subject of modus operandi testimony was discussed at oral argument, where Diaz argued that such testimony cannot include mens rea descriptions, see, e.g., Diaz, Transcript of Oral Argument at 37:18-20, 2024 WL 3056012 (No. 23-14)(Fisher)("Descriptive modus operandi evidence that does not speak to mens rea directly is perfectly fine.").  The Court thus views Diaz' holding as one about the permissible scope of modus operandi testimony, permitting law enforcement experts' testimony how criminals typically operate to include descriptions of such criminals' mental states; the expert may neither opine that the accused defendant specifically belongs to the class of criminals bearing a particular mental state, nor may the expert opine that all members of a class to which the defendant indisputably belongs bear a particular mental state.  The Court shares Justice Jackson's view that this rule serves both prosecutors and defendants, a view which resonates with the one discussed above that modus operandi testimony and victim behavior testimony are two sides of the same coin.

Although not implicated directly in the facts of Bindues' case, Diaz' rule likely will impact the use of expert testimony in future enticement and sex abuse prosecutions.  Diaz would prohibit O'Donnell from testifying that all persons like Bindues possess such-and-such a mens rea, but given the scope of his proposed testimony, O'Donnell's testimony does not run afoul of that rule,

Thus, in the Court's view, the model of grooming that O'Donnell offers is no less fit a subject for 702 testimony than is any model of criminal behavior.  Concerns that O'Donnell's model lacks predictive power, lacks testability, or lacks verifiability, are no less applicable to models of how drug traffickers operate, how gangs operate, or how arsonists operate.  See United States v. Womack, 55 F.4th 219, 228-29 (3d Cir. 2022)(drug trafficking modus operandi); United States v. Pritchard, 964 F.3d at 525-26 (arsonist modus operandi); Wright & Miller, supra, § 6269.4 ("Daubert is applicable to expert testimony regarding gang activities. . . . Daubert also applies to expert opinion testimony concerning the structure, leadership, funding, and activities of foreign terrorist organizations.").  In all these cases, whether the behavioral model succeeds depends on whether the jury convicts, or the defendant pleads: the model may predict guilt, given certain conditions' existence, but it must acclimate to those facts the jury, the ultimate fact-finder, finds.

The same considerations apply to the flipside of the criminological coin: expert testimony about how crime victims typically behave, e.g., victims of sexual abuse.  See United States v. Eagle, 515 F.3d 794, 801 (8th Cir. 2008)("In child sexual abuse cases, 'a qualified expert can inform the jury of characteristics in sexually abused children and describe the characteristics the alleged victim exhibits.'" (quoting United States v. Kirkie, 261 F.3d 761, 765-66 (8th Cir. 2001)); United States v. Chapman, 59 F. Supp. 3d at 1222-23 ("In the same way that [an] expert [may] . . . testify about the characteristics of sexual assault victims, without examining the victim in the case, Starr may testify about victims of domestic abuse and self-injury, without examining D. Chapman in this case.").  These models also cannot be verified -- i.e., tested for their accuracy

---

because he offers testimony generally along the lines that Diaz permits: general-issue, modus operandi testimony about the behavior of sex abusers who engage in grooming.

in predicting whether a particular alleged victim was, in fact, abused -- except by testing the model against a guilty verdict or guilty plea that a particular person actually abused the alleged victim. This body of knowledge -- although populated often by psychologists, psychiatrists, and social workers -- has a necessarily criminological character. Models of abuse victim behaviors predict whether a person displays behaviors consistent with victims of abuse, i.e., consistent with victims of crime. The American system does not leave to sciences of pure inquiry the determination whether such victimization in fact occurred, but commits it instead to the judicial process.

The Court therefore agrees in part with the Honorable Paul A. Engelmayer, United States District Judge for the United States District Court for the Southern District of New York, whose holdings in United States v. Randall, No. CR 19-0131, the Court views as offering a partial response to the issue. There, Judge Engelmayer, considering expert testimony about abuse victim behaviors and typologies, rejects a similar argument that the expert's testimony is unreliable because it lacks a known error rate, and is not predictive, but instead post-hoc inquiry:

> The absence of large quantity statistical studies is explained by a practical reason that should be obvious to all. Studying the circumstances and psychological drivers of trafficked women is not like studying diseases or potential cures in laboratory animals. In those studies, laboratory conditions literally can be achieved. . . .
>
> That strictly quantitative mode of inquiry is not realistic or even ethical in the context of studying sex trafficking. The causes and contributors to sex trafficking by their nature must be studied retrospectively. They cannot ethically be studied otherwise. Subjects cannot be tested to see under what circumstances they would and would not, on a going forward basis, fall prey to the predations of sex traffickers. Given the necessarily retrospective nature of such a study, given the small size of the populations under review, and given the inherently individualized circumstances presented by different perpetrators, victims, and contexts in this tumultuous and emotionally fraught area of criminal conduct, the vocabulary of error rates and statistical significance is an unusually poor fit.

United States v. Randall, No. CR 19-0131, Transcript at 29:2-7 (Court)(S.D.N.Y. Mar. 5, 2020)(Doc. 335); id. at 29:14-30:2 (Court).  See United States v. Maxwell, 2021 WL 5283951, at *3 (quoting the above language).  The Court agrees with Judge Engelmayer that neither the lack of error rate nor the after-the-fact character of this body of study is fatal to the subject matter's Daubert propriety.  The Court views, however, the deeper issue as the one discussed above, namely that this area of expertise is not a body of neutral scientific inquiry that can be separated conceptually from the judicial process: although a model of abuse victim behavior points to facts in the world -- whether a particular person actually was abused, facts which explain why he or she demonstrates a set of behaviors common to such persons -- the judicial system demands only that a jury find those facts or that a defendant admit to them.  The problem is thus not only the practical or ethical difficulties of testing these models' hypotheses; no laboratory beside the courtroom is an acceptable one for establishing those facts against which these models' predictive power may be validated.

Bindues' critiques thus apply equally to all criminological theories, all of which demand testing against fact-finding processes the judicial system countenances.  That, in the abstract, these models lack an error rate is not fatal to their Daubert propriety, however.  Criminal behavior is a proper subject of study and expertise, and experts may testify about modus operandi; experts may also testify about the flipside of that body of knowledge, i.e., the common characteristics of victims of crime.  In this sense, experts' modus operandi testimony and experts' testimony about victim behaviors are two sides of the same coin: both study how criminals typically commit crimes and how crimes typically impact victiMs.  Both areas of study face the similar lack-of-error-rate problem, because theories of criminal and victim behavior are testable only against the outcomes of the judicial process: guilty or not guilty.  Although technical and other bases may produce

outcomes in tension with the full evidentiary body available -- e.g., when evidence is suppressed for Constitutional reasons -- still, criminological models cannot fly in the face of the judicial process' determinations: it is not the place of these theories to say a jury got it wrong, because the model predicts that a defendant should be guilty, for example.

Accordingly, Bindues' arguments that O'Donnell's grooming testimony is unreliable are unpersuasive, because they apply no less to all modus operandi testimony and victim behavior testimony, which are widely regarded as proper subjects for rule 702 testimony.   Ultimately, testimony about how groomers groom is equivalent to testimony about how certain sexual abusers plan, carry out and attempt abuse.   The foregoing discussion's purpose is not to reconceptualize grooming for clinical or investigative purposes -- the Court is not a psychologist, social worker, or law enforcement agent -- but seeing grooming conceptually as part of sexual abuse behavior, i.e., grooming as abuse's plan or attempt, makes clear that expert testimony about grooming is simply testimony about a distinctive kind of criminal behavior, and law enforcement officers may testify about how criminals engage in their conduct.   See Wright & Miller, supra, § 6269.4 ("Expert testimony concerning the modus operandi of drug dealers and other criminals is subject to Daubert analysis."); 4 Weinstein's Federal Evidence § 704.06 ("Expert testimony about the modus operandi of drug dealers does not violate Rule 704(b), even if elicited through hypotheticals that mirror the facts of the case.").   This subject is one fit for expert study, and, as modus operandi testimony, a fit subject under Daubert.   Some difficulty always may attend identifying particular instances of grooming behavior: because grooming behavior is differentiable from normal behavior only by a wrongful intent invisible to the naked eye, an intent that necessarily must be inferred, it will always to some extent be difficult to spot.   That the conduct is difficult to spot, however, does not mean that it lacks identifying conditions or that it has no conceptual contours -- those conditions are ones

about a person's mental state, and a determination which is achievable only through the criminal justice process.

For all the above reasons, the Court concludes that, for <u>Daubert</u> purposes, grooming does not, for the reasons Bindues articulates, reflect unreliable principles.  Grooming is best conceptualized as one manner or modus operandi by which abusers commit abuse.  Viewing grooming as a means of accomplishing criminal abuse clears up conceptual confusion about lack of verifiability, and makes clear that it is no less a proper subject for inquiry and expertise than is any other kind of criminal conduct or crime victim typology.  Insofar as experts may testify reliably about criminals' modus operandi and crime victims' behaviors, O'Donnell may testify reliably about grooming.

### ii.    O'Donnell's Grooming Testimony Is Not Unhelpful for the Conceptual-Confusion Reasons Bindues Advances.

As noted, some of Bindues' arguments about grooming's conceptual confusion are framed as unhelpfulness arguments under <u>Daubert</u>.  <u>Cf.</u> March 2 Tr. at 83:21-84:9 (Jones)("[Y]es, [grooming is] a concept.  But I don't think it's helpful. . . . [I]t's so malleable.  It's so undefined. It's so unclear as to what it actually means that I don't know how to determine whether it occurred or not.").  Grooming, understood as modus operandi information, is not unhelpful, because it explains for jurors that some sexual abusers carry out a long-term plan to abuse their victiMs.  Knowing that abusers may operate in this way -- that the concept has a name and a conceptual framework -- may help jurors make sense of what the United States alleges Bindues did: engage in a longterm plan to induce his victim to submit to abuse.  Bindues' arguments about grooming's conceptual confusion -- that it is "undefined," "malleable," and "unclear" -- the Court rejects above: the concept is not malleable and unidentifiable in the ways that Bindues suggests,

because, to the extent he suggests what is grooming can never be parsed out from what is not grooming, he is incorrect, because, as noted above, grooming is behavior outwardly normal but motivated by a hidden intent to abuse.  That such an intent is invisible to the naked eye and must be inferred does not mean the concept lacks conceptual contours.  Nevertheless, the Court agrees, that this consideration does not obviate the difficulty-of-spotting issue, one that always will attend determining whether particular instances of grooming occur.  The concept, however, is helpful alone in providing jurors language and a framework by which to approach charged crimes.  The Tenth Circuit and others have adopted the view that this modus operandi information is helpful because it may dispel common misconceptions about sexual abusers.  Cf. Batton, 602 F.3d at 1201-02 ("We do not find the trial court abused its discretion in concluding the jurors would benefit from learning of the modus operandi of sex offenders.  The methods sex offenders use are not necessarily common knowledge. . . ."); Isabella, 918 F.3d at 833 n.15 ("Grooming can be established by use of an expert witness who testifies about psychological tactics that are common in cases of child sex abuse."); United States v. Romero, 189 F.3d at 584 ("Lanning's testimony in general would be reliable and helpful to the jury. . . . in dispelling from the jurors' minds the widely held stereotype of a child molester as 'a dirty old man in a wrinkled raincoat[.]' . . . Many real-life child molesters use modern technology and sophisticated psychological techniques to 'seduce' their victims." (no source given for quoted language)).

Although it remains true that the theory cannot be applied easily, that fact is the nature of the concept: the concept speaks to a species of behavior outwardly normal, but identifiable only by a hidden criminal intent, which a jury must infer.  Learning about the framework, however, may help jurors approach the evidence, to determine whether it evinces a long-term plan to subject Bindues' minor victim to abuse.  Where Daubert helpfulness is a relevance inquiry, and, in the

context of general-principle testimony, that inquiry is one whether the principles explicated "fit" the case, then O'Donnell's general-principle information is relevant and helpful insofar as it provides a useful vocabulary for jurors to assess what the United States alleges Bindues did. Learning that grooming reflects a modus operandi for offenders engaging in similar conduct with which the grand jury charges Bindues is not redundant and does not displace the jury's role.  Cf. Ram v. N.M. Dep't of Env't, No. CIV 05-1083, 2006 WL 4079623, at *10 (D.N.M. December 15, 2006)(Browning, J.)("In making [the helpfulness] determination, the court should consider, among other factors, the testimony's relevance, the jurors' common knowledge and experience, and whether the expert's testimony may usurp the jury's primary role as the evaluator of evidence."). As the Court notes above, grooming is one method by which abusers commit their crimes, i.e., not all abuse occurs through a period of grooming; for this reason, expert testimony explaining grooming will not "fit" every abuse charge.

       Under rule 702, O'Donnell's testimony satisfies Daubert's requirements.  O'Donnell is qualified by his experience and training to testify about grooming.  The Tenth Circuit and every other Court of Appeal to consider the issue hold that grooming is a proper subject of expert testimony.  This broad consensus already effectively forecloses the rationales -- grounded in grooming's alleged conceptual confusion -- that Bindues offers to the Court to exclude O'Donnell's testimony.  The two out-of-Circuit district court cases, Raymond and Goyner, do not persuade the Court to stake out a position so against the norm.  Even if his arguments are not already foreclosed, Bindues' specific arguments against grooming's unreliability and unhelpfulness do not convince the Court to exclude testimony about grooming.  First, Bindues' lack-of-definitional-consensus argument is unavailing, because the Court sees widespread agreement, not disagreement, in the expert community how to define grooming.  Second, Bindues'

lack-of-testability argument does not convince the Court to exclude O'Donnell's testimony, because it proceeds from a misunderstanding about what conditions identify grooming behavior, and the critique would apply equally to all modus operandi testimony; insofar as it is widely agreed that modus operandi testimony may be reliable and helpful, Bindues' arguments do not prevail. O'Donnell's general-principle testimony about grooming satisfies rule 702's reliability and helpfulness standards.

## II.     O'DONNELL'S TESTIMONY SATISFIES RULE 403.

The Court will not exclude O'Donnell's expert grooming testimony on the basis of rule 403 balancing, because the testimony is not substantially more unfairly prejudicial than probative. For reasons related to those discussed in the Court's <u>Daubert</u> analysis, the Court concludes that O'Donnell's testimony has low probative value, but that it is also has low prejudicial value; because the testimony is roughly equally unprejudicial and non-probative, rule 403 does not exclude the evidence, which must be substantially more unfairly prejudicial than probative.  An expert's general-issue testimony, not applied to the case's facts, is of low prejudicial value, and Bindues' expert, whom the Court will permit to testify about the flaws in O'Donnell's testimony, will further reduce the unfair prejudicial value of O'Donnell's testimony.

A trial court can still exclude otherwise proper expert testimony, <u>i.e.</u>, testimony that is reliable and helpful, under 403 if the testimony is substantially more prejudicial than it is probative; indeed 403 balancing is particularly important in the expert testimony context, because juries will be less equipped to evaluate the weight of testimony that comes across as conveying expert information:

> Rule 403 permits the exclusion of relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ." Judge Weinstein has explained: "Expert

evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses." [Jack B. Weinstein, <u>Rule 702 of the Federal Rules of Evidence Is Sound; It Should Not Be Amended</u>, 138 F.R.D. 631, 632 (1991).]

<u>Daubert</u>, 509 U.S. at 595.

      Expert testimony about grooming does not violate rule 403. As the Ninth Circuit explains, this testimony merely provides an explanation of an expert's background knowledge. <u>See</u> <u>United States v. Telles</u>, 18 F.4th at 303 ("Nor did the admission of Dr. Turner's testimony violate Rule 403 . . . . Dr. Turner did not testify as to Telles or T.B. specifically—he 'merely gave a straightforward account of relevant background information based on [his] own knowledge and experience.'" (quoting <u>United States v. Johnson</u>, 860 F.3d 1133, 1141 (8th Cir. 2017))).

      The probative value of O'Donnell's testimony is not very high, but neither is its prejudicial value very high. Because O'Donnell's testimony is general issue testimony unapplied to the case's facts, its value goes to explaining the concept of grooming, and providing a vocabulary and a framework to understand the charges against Bindues. The probative value of this concept is low. Jurors will learn that grooming is a set of outwardly normal behavior, driven by a hidden criminal motive; they will learn that the only thing that distinguishes normal conduct from grooming conduct is the presence of a wrongful intent, leaving open the question whether, in particular cases, that intent exists. The jury thus essentially will be confronted with the task before it, namely, determining whether a criminal intent underlay all the actions allegedly taken here. Perhaps the only novel insight that O'Donnell's testimony will provide is that such actions can happen, <u>i.e.</u>, that some persons do engage in long-term, coordinated efforts to seduce and entice victims into abuse, and that not all abuse is the result of abduction or outright rape. <u>See</u> March 2 Tr. at 95:16-20 (Roybal)("Here's an example of a child sexual abuse case that would not be considered

grooming: Forcible rape of a child, drugging of a child, abduction of a child. That is not the circumstance that we are dealing with here today."). To learn, however, that such conduct is possible is not different from learning that other people engage in enticement, i.e., are charged and convicted criminally under the statute that Bindues is charged. Cf. United States v. Flechs, 98 F.4th 1235, 1244 (10th Cir. 2024)("§ 2422(b) 'criminalizes the sexual grooming of minors, regardless of any intent to consummate the illegal sexual activity.' . . . The statute thus 'requires only that the defendant intend to entice a minor, not that the defendant intend to commit the underlying sexual act.'" (quoting United States v. Faust, 795 F.3d 1243, 1249 (10th Cir. 2015))); id. at 1249 ("Under the requisite 'highly fact-specific inquiry,' [to find a substantial step,] Mr. Flechs's actions fell on the 'illegal inducement' side of the line. . . . Mr. Flechs took a substantial step toward enticement by exchanging sexual messages with the minor, arranging to meet him, and travelling to the meeting place." (quoting Isabella, 918 F.3d at 832 (in turn quoting United States v. Faust, 795 F.3d at 1248))). O'Donnell will testify only about what grooming is and will not testify that Bindues engaged in grooming, because such testimony would run afoul of rule 704(b)'s prohibition on ultimate issue mens rea testimony: were O'Donnell to testify that Bindues engaged in grooming, O'Donnell would be testifying that Bindues engaged in his conduct with a criminal intent to abuse the alleged victim, i.e., O'Donnell's testimony would be equivalent to saying that Bindues possessed at the time the mens rea for the crime charged. See Fed. R. Evid. 704(b); n.10 supra, at 74-76 (discussing Diaz). Because grooming is so hard to identify in isolation, because the only thing that differentiates normal from grooming behavior is the existence of an invisible criminal intent that must be inferred, and because it is a model of behavior whose predicted values only a judicial process can verify, the probative value of this information is low.

The prejudicial effect, however, is equally low, so rule 403 does not bar O'Donnell's testimony.   For one, O'Donnell's testimony is only general issue testimony, so its prejudicial effect is lower than if O'Donnell applied the theory's facts to the case; indeed, as noted above, the availability is limited to apply a construct like grooming to the facts of Bindues' case, because if, e.g., O'Donnell opines that Bindues engaged in grooming, this testimony would constitute impermissible ultimate issue, mens rea testimony in violation of rule 704(b), because it would be tantamount to opining that Bindues willfully enticed his victim into sexual contact.   Moreover, the Court will permit Bindues' expert to testify, allowing Viljoen to poke holes in grooming theory's predictive value, reducing the prejudicial effect of O'Donnell's testimony by testing it with contrary expert testimony.   See United States v. Murra, 879 F.3d 669, 678-79 (5th Cir. 2018)("Murra proffered her own expert . . . who countered Dr. Wolf's testimony by testifying about both the concept of trauma generally and what she perceived to be a lack of reliable research on the viability of the 'trauma bond' concept." (no citation given for quoted material)); United States v. $ 307,970.00 in U.S. Currency, No. CIV 12-0136, 2019 WL 2173432, at *7 (E.D.N.C. May 20, 2019)(Flanagan, J.)("Prevost's testimony and evidence of [a drug dog's] sniff is highly probative. . . . Any prejudice . . . is neither unfair nor substantially outweighs the probative value . . . . Claimants have video footage of traffic stop, the ability to cross-examine Prevost, and opportunity to call their own expert to interpret the evidence of the sniff.").

Two additional issues that Bindues raises about O'Donnell's testimony do not create rule 403 probleMs.  First, to the extent that Bindues argues that what grooming is, how to spot it, etc., will confuse the jury, see March 2 Tr. at 84:5-9 ("[Grooming] is a concept. But it's so malleable. It's so undefined. It's so unclear as to what it actually means that I don't know how to determine whether it occurred or not."); id. at 81:10-12 (Court)(recognizing Bindues' "403

[arguments] . . . [that] you're concerned about [juror] confusion"), this argument is misplaced.  As the Court discusses above, grooming may be difficult to identify and to differentiate from innocent behavior, but that difficulty does not mean the task is impossible.  Telling grooming behavior apart from normal behavior is a matter of drawing inferences about the offender's intent, an inquiry germane to the jury.  Cf. People v. Fernandez, 64 A.D.3d 307, 310 (N.Y. App. Div. 2009)("Mens rea is the particular province of the jury because it is elusive as well as subjective, and all but invariably is determined by drawing from objective facts -- which may be inconsistent, fraught with ambiguity or both -- inferences about a subjective matter that are informed by human experience.").  Bindues' prosecution is not per se for grooming under the enticement statute, because he allegedly succeeded in making sexual contact, while grooming is typically treated as attempt-to-entice.  See United States v. Flechs, 98 F.4th 1235, 1244 (10th Cir. 2024)("§ 2422(b) 'criminalizes the sexual grooming of minors, regardless of any intent to consummate the illegal sexual activity.' . . . The statute thus 'requires only that the defendant intend to entice a minor, not that the defendant intend to commit the underlying sexual act.'" (quoting United States v. Faust, 795 F.3d 1243, 1249 (10th Cir. 2015))); United States v. Flechs, 98 F.4th at 1249 ("Under the requisite 'highly fact-specific inquiry,' [to find a substantial step,] Mr. Flechs's actions fell on the 'illegal inducement' side of the line. . . . Mr. Flechs took a substantial step toward enticement by exchanging sexual messages with the minor, arranging to meet him, and travelling to the meeting place." (quoting Isabella, 918 F.3d at 832 (in turn quoting United States v. Faust, 795 F.3d at 1248))).  Nonetheless, the difficulty of applying O'Donnell's grooming model to the facts here is in effect no different from applying the enticement statute to Bindues' behavior.  Concern that the jury will not be able to tell what is and is not grooming is essentially the same as concern that the

jury will not be able to tell what is and is not enticement, which is what Bindues' prosecution tasks them with doing.   This difficulty is not the possibility of confusion against which rule 403 guards.

Second, to the extent that these same concerns also prejudice Bindues, the prejudice is not unfair.  Bindues is incorrect to the extent he suggests that, because of the concept's malleability, the jury, learning about grooming, automatically will think that Bindues engaged in that conduct; this concern essentially recapitulates the incorrect view that grooming lacks all identifying features and truth conditions.  The jury will think Bindues himself groomed his alleged victim only if the United States proves that an intent to abuse her motivated his behavior.  Insofar as the jury may interpret any of his behaviors as consistent with grooming -- i.e., outwardly normal conduct motivated by a hidden criminal impulse -- that prejudice is not unfair.  It is not unfair prejudice that the United States offers a vocabulary to articulate a sinister explanation for conduct also explainable innocently: that the grooming model provides a framework into which to slot the evidence adduced about Bindues' conduct simply is information that may hurt Bindues' trial position.  Such prejudice is not unfair.  Cf. United States v. Burgess, 576 F.3d 1078, 1098-99 (10th Cir. 2009)("[E]vidence [improper under rule 403] must do more than 'damage the Defendant's position at trial,' it must 'make[ ] a conviction more likely because it provokes an emotional response . . . or otherwise . . . affect[s] adversely the jury's attitude toward the defendant *wholly apart* from . . . his guilt or innocence [*sic*] of the crime charged.'" (quoting United States v. Tan, 254 F.3d 1204, 1211-12 (10th Cir. 2001))(emphasis in United States v. Tan)(correction in United States v. Burgess, but not in United States v. Tan)).

Accordingly, the rule 403 risk of unfair prejudice is low and roughly equal with O'Donnell's testimony's low probative value.  Because, however, these competing values are roughly equal, the Court will not exclude O'Donnell's testimony on the basis of rule 403, because

the testimony's prejudicial effect does not substantially outweigh its probative value.  Having concluded that O'Donnell's testimony about grooming satisfies Daubert's rule 702 standard and that it satisfies rule 403's balancing test, the Court will permit him to testify.

**IT IS ORDERED** that the Defendant's *Daubert* Motion to Preclude Testimony of Daniel O'Donnell, filed February 8, 2023 (Doc. 74), is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Alexander M. M. Uballez
  United States Attorney
Patrick Cordova
Jaymie L. Roybal
  Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

     *Attorneys for the Plaintiff*

Alexandra W. Jones
Jones Law Firm LLC
Albuquerque, New Mexico

     *Attorneys for the Defendant*